# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3384

_____

United States of America,              *
                                         *
        Appellee,             *
                                         *   Appeal from the United States
       v.                   *   District Court for the Western
                                         *   District of Missouri.
Carl Haskell,                 *
                                         *
        Appellant.           *

_____

Submitted: June 15, 2006
Filed: November 13, 2006

_____

Before ARNOLD and BEAM, Circuit Judges, and DOTY,[1] District Judge.

_____

BEAM, Circuit Judge.

Carl Haskell appeals his convictions for conspiracy to murder a federal witness and for murdering a federal witness. Finding no error, we affirm.[2]

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota, sitting by designation.

[2]Trial was held before the Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri. The district court proceedings spanned nearly four years and also came before the Honorable John T. Maughmer, Chief United States Magistrate Judge for the Western District of Missouri, who produced reports and recommendations adopted by Judge Gaitan.

## I. BACKGROUND

In October and November 1997, Cornelius Peoples, Xavier Lightfoot, and Larry Platt committed a number of armed robberies of banks and jewelry stores in Omaha, Nebraska. In December 1997, Lightfoot's romantic partner, John Hogsett, also known as Jovan Ross, contacted the police and the Federal Bureau of Investigation (FBI), telling them about the robberies and the location of the proceeds. On December 12, 1997, Lightfoot was charged in federal court with bank robbery. Lightfoot was arrested and ordered to remain in custody until trial. The government subpoenaed Hogsett to testify at trial. In February 1998, the government disclosed through pre-trial discovery that Hogsett would be the primary witness at Lightfoot's July 1998 trial. However, Lightfoot's trial would be postponed.

Cornelius Peoples visited Lightfoot in Leavenworth, and the two devised a plan to kill Hogsett to prevent testimony at Lightfoot's trial. Peoples contacted Curtis Barfield and Anthony Hunter and promised money for locating a killer. Barfield and Hunter located Carl Haskell, who agreed to do the killing for a portion of the money. Barfield and Hunter gave Haskell information about Hogsett, who was killed on June 8, 1998. Haskell was ultimately tried and found guilty of conspiracy to murder a federal witness and murdering a federal witness. He appeals.

## II. PRE-TRIAL MOTIONS

### A. Pre-Indictment Delay

Hogsett was murdered on June 8, 1998. Initially, only Lightfoot and Peoples were charged with the murder. During Lightfoot's and Peoples' trial, on October 30, 1999, Platt came forward with his attorney, to give information to the FBI. At that time, Platt identified Hunter as being involved in the murder.

On December 17, 1999, Hunter submitted to an FBI interview and identified witnesses and co-conspirators. Hunter gave the FBI the names of Carl Haskell and Curtis Barfield, as well as the nickname "Little J." The FBI attempted to identify these individuals through photographs. Haskell and Barfield were identified, but it took seven photo arrays for Hunter to identify "Little J" as Quinton Jones on September 18, 2000. In September and October 2000, the FBI interviewed Freddie McIntosh. In October 2000, the FBI interviewed Ronald Smith, Jr. On October 18, 2000, Haskell was indicted for Hogsett's murder. On February 17, 2001, the FBI interviewed Quinton Jones.

Haskell moved to dismiss the charges for pre-indictment delay, and we review for clear error the district court's denial of this motion. United States v. Sturdy, 207 F.3d 448, 452 (8th Cir. 2000). To prove a violation of the Fifth Amendment's due process right against unreasonable pre-indictment delay, Haskell "must establish that: (1) the delay resulted in actual and substantial prejudice to the presentation of the defense; and (2) the government intentionally delayed his indictment either to gain a tactical advantage or to harass him." Id. at 451-52. Haskell's argument is unavailing.

Haskell failed to show that the government intentionally delayed the indictment. Haskell points to a ten-month gap between the time Hunter provided Haskell's name to the FBI and the time Haskell was indicted. However, Haskell neglects to note the FBI's diligence in working with reluctant informants and with the Kansas City, Kansas, police to identify potential suspects and witnesses, like Jones, known only by nicknames. Given these circumstances, Haskell has not shown that the government intentionally delayed the indictment, much less that any delay was tactically designed or for harassment purposes. We find no clear error in the district court's refusal to dismiss due to pre-indictment delay.

## B.    Severance of Trials

Prior to trial, Haskell moved to sever his trial from Barfield's, and the district court denied this motion. When the motion to sever is not renewed during trial, we review a pre-trial severance denial for plain error, United States v. Mathison, 157 F.3d 541, 546 (8th Cir. 1998),[3] and reverse only if there was a misjoinder which had a substantial and injurious effect or influence on the verdict. United States v. Lane, 474 U.S. 438, 449 (1986). Haskell moved for severance because Clarence Burnett was expected to testify about statements made by Barfield, and Haskell would be unable to cross-examine Barfield about these statements, since Barfield did not testify.

Burnett was incarcerated in the same prison as Barfield and was known as a person who could help other inmates. At the joint trial, Burnett testified Barfield told him that Hunter had approached Barfield to organize a murder of a federal informant and Barfield had agreed to the murder. Contrary to Haskell's contentions, Burnett's testimony only applied to Barfield and did not implicate Haskell in any way. In fact, Burnett's testimony implying involvement of anyone other than Barfield was limited to Hunter's involvement and a cryptic reference to "they," which could have referred to witnesses, to Hunter, or to someone with whom Barfield conspired to commit the murder. The testimony did not inculpate Haskell or prevent him from presenting a defense. Cf. United States v. Tootick, 952 F.2d 1078, 1081-83 (9th Cir. 1991) (requiring reversal if defendants are misjoined in trial where acquittal of one necessitates the conviction of the other only if the defendants can demonstrate clear and manifest prejudice). The district court did not plainly err in denying Haskell's severance request.

---

[3]We recognize that the standard of review applicable to the denial of severance motions has been a subject of debate. However, even under the abuse of discretion standard adopted in United States v. Flores, 362 F.3d 1030, 1039 (8th Cir. 2004), the outcome in this case would be unchanged.

## III.   VOIR DIRE MATTERS

Haskell alleges that the government used peremptory strikes in a discriminatory manner during voir dire.  In Batson v. Kentucky, the Supreme Court recognized that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."  476 U.S. 79, 89 (1986).  The Court went on to prescribe the process for determining whether peremptory strikes have been used in a discriminatory manner.  Initially, the opponent of the peremptory strike must make a prima facie showing that the peremptory strike is being used to exclude jurors in a racially discriminatory manner.  Id. at 96-97.  Once the opponent has met this burden, the proponent of the peremptory strike must provide a neutral explanation for the challenge.  Id. at 97.  Finally, the trial court has "the duty to determine if the [opponent] has established purposeful discrimination."  Id. at 98.  Because the burden of proving discrimination never shifts from the opponent of the peremptory strike, the opponent of the peremptory strike typically is allowed to "put forth evidence probative of pretext" during this third step.  Moran v. Clarke, 443 F.3d 646, 652 (8th Cir. 2006).  The district court's determination of whether the explanation is race neutral is largely a credibility finding, Batson, 476 U.S. at 98, n.21,  and is reviewed for clear error.  United States v. Elliott, 89 F.3d 1360, 1365 (8th Cir. 1996).

Haskell objected to the government's use of peremptory strikes against jurors Echols, Dobbs, and Long.  We assume, without deciding, that Haskell made a prima facie showing of discrimination.  The government, as the proponent of the strikes, explained its reasons for challenging these jurors.

The government's race-neutral reason for striking Echols was that Echols faced a charge of driving on a suspended license.  The pending charges would require Echols to make court appearances, and the government inferred from the nature of the charges that Echols likely used drugs or alcohol.  The proffered reason for striking Dobbs was that she unequivocally stated that she could not impose a death sentence.

Finally, the government's reasons for striking Long were that her views on the death penalty were not strong and that she knew someone involved in the case.

Haskell attempted to rebut these explanations by offering "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." Miller-El v. Dretke, 545 U.S. 231, 241 (2005). If Haskell's comparisons were to show similarities, this evidence would be probative of pretext, id., but each of Haskell's comparisons fails to demonstrate similarities.

First, Haskell compares Echols to a white juror who also had a drug problem. However, this comparison does not account for Echols' upcoming court date, a difference sufficient to defeat any similarity between the two.

Second, Haskell compares Dobbs to a number of white jurors, including Wood and Ellis. When asked by the prosecution, "could you return a sentence of death?" Dobbs responded, "No." The prosecutor followed up this question with, "Not under any circumstances could you do that?" Again, "No." Though Dobbs later softened responses when questioned by defense counsel, no other venire person pointed out by Haskell responded in this manner. For example, white prospective juror Wood, to whom Haskell points in particular, when asked the same question, "could you return a sentence of death?" answered simply, "[y]es." The same is true of prospective juror Ellis.

Finally, Haskell compares Long's views on the death penalty to those of white juror Lillis. However, during the Batson hearing and in its brief, the government explained that Long was challenged not just for her views on the death penalty, but also because she knew someone involved in the case. Having reviewed the record, we cannot say that the district court clearly erred in deciding that the government's peremptory challenges were not used in a racially discriminatory manner.

## IV.  EVIDENCE EXCLUDED AT TRIAL

### A.  Standard of Review

Haskell challenges the district court's exclusion of evidence at his trial.  The district court has wide discretion in excluding evidence, and its decision will not be disturbed unless there is a clear and prejudicial abuse of discretion, which had a substantial influence on the jury's verdict.  McPheeters v. Black & Veatch Corp., 427 F.3d 1095, 1101 (8th Cir. 2005).

### B.  Cross-examination of Anthony Hunter

Hunter testified that he had organized Hogsett's murder.  Peoples agreed to pay him $100,000 for the murder, but Hunter did not want to commit the murder himself because he thought that he was under federal investigation.  Hunter contacted Barfield and agreed to split the money with him, if Barfield found a shooter.  Barfield contacted Haskell, who showed up to do the killing in exchange for $10,000.

Haskell successfully cross-examined Hunter and established that Hunter's plea agreement required Hunter to cooperate and testify against Haskell.  Because of the plea agreement, the government had not sought the death penalty against Hunter.  The government also had sole discretion to determine whether Hunter's testimony merited a substantial assistance motion and the recommendation of fifteen years' imprisonment, rather than the otherwise mandatory term of life imprisonment without parole.  Additionally, Hunter had pled guilty to kidnaping in a different case, and the government had dropped counts of aggravated robbery, aggravated assault, and auto burglary.

The district court excluded Haskell's proposed cross-examination about multiple assaults Hunter committed while at a detention center.  Haskell argues that this

evidence would tend to show that Hunter believed he could act with impunity after he had begun cooperating with the police and that he was immune from the consequences of criminal activity.

Trial judges may "'impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" United States v. Purkey, 428 F.3d 738, 753 (8th Cir. 2005), cert. denied, 75 U.S.L.W. 3205 (U.S. Oct. 16, 2006) (No. 05-11528) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). We reverse only when the trial court clearly abuses its discretion by limiting cross-examination and the limitation prejudices the defendant. Id. Though "'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination,'" id. (quoting Davis v. Alaska, 415 U.S. 308, 316-17 (1974)), it is not the case that a judge should be "prevented from imposing limits of any sort on defense counsel's inquiry into the potential bias of a prosecution witness." Id. (citing Van Arsdall, 475 U.S. at 679).

We have considered a similar situation, in which a defendant alleged that "his [S]ixth [A]mendment right to confront an adverse witness" was violated when cross-examination regarding assaults in a detention center was excluded. Id. There, the defendant had been allowed to cross-examine the adverse witness about his motive to testify, which, in that case, was a desire for leniency in the form of a government "motion under Federal Rule of Criminal Procedure 35, requesting a reduction of [the adverse witness'] sentence." Id. at 754. Here, the trial court did not abuse its discretion by limiting cross-examination of Hunter in this manner. Additional cross-examination into Hunter's prison behavior would not have led a reasonable jury to have a different impression of Hunter's credibility, id. at 753, given that the jury was informed of the nature of Hunter's cooperation with the government, and Haskell has not shown that he was prejudiced. There was no reversible error.

## C. Cross-examination of Quinton Jones

Jones testified at the trial that he had driven Haskell to Hogsett's house and had witnessed Haskell murder Hogsett. Haskell contends that the district court erred in limiting his cross-examination of Jones. At the time Jones initially gave information to the police about the Hogsett killing, Jones was being questioned in connection with another murder, to which he eventually confessed under coercion. He later recanted that confession and was acquitted at trial. When Jones testified at Haskell's trial, he had pending misdemeanor weapons charges in Louisiana. Haskell sought to inquire into the murder charges against Jones, his recanted confession, and the pending misdemeanor charges, and the district court determined that these topics were not appropriate for cross-examination.

In the area of cross-examination, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679.

The district court correctly excluded any inquiry into the pending misdemeanor weapons charges, which would not have proven bias. Jones testified that he had no deal with the government and had been offered no consideration for his testimony at Haskell's trial. Therefore, information about the pending charges was irrelevant and an improper subject for cross-examination. United States v. Farid, 733 F.2d 1318, 1320 (8th Cir. 1984).

In addition, an inquiry into the circumstances surrounding Jones' initial statement to the police was also irrelevant. Though at the time of the initial statement, Jones may have had an incentive to implicate Haskell, no incentive existed at the time of Haskell's trial, because Jones had been acquitted. Cf. Van Arsdall, 475 U.S. at 679

(remanding for harmless error analysis of Confrontation Clause violation which consisted of exclusion of cross-examination of adverse witness regarding explicit agreement whereby government dismissed charges in exchange for testimony). Haskell also sought to inform the jury about Jones' previous murder charge to reflect his credibility, which was not relevant to prove truthfulness and was an improper subject for impeachment. Fed. R. Evid. 608(b). See Farid, 733 F.2d at 1320. Accordingly, the district court properly limited the cross-examination of Jones.

### D. The Note

At trial, Terrance Hampton, an inmate incarcerated with Peoples in Kansas City, Missouri, testified that Peoples made statements to him. In particular, Hampton testified that Peoples stated "I took care of that, boom boom, you know, I handled that" and pointed his finger like shooting a gun. The district court excluded testimony from Hampton about the contents of a note that Peoples used to communicate with Lightfoot, which Haskell had sought to introduce.

Though Haskell has a fundamental right to present witnesses in his own defense, Chambers v. Mississippi, 410 U.S. 284, 302 (1973), he still "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." Id. In the offer of proof, Hampton testified "I didn't read [the note], but I did see the writing, see some writing on the pad." The district court did not abuse its discretion by excluding testimony about the contents of this note, because Hampton lacked personal knowledge of its contents. Fed. R. Evid. 602.

### E. The Videotape

The district court deemed inadmissible video footage which Haskell sought to introduce. The video footage showed Hogsett and Lightfoot taking pictures of the Omaha Police Department's parking lot, a romantic exchange between Hogsett and

Lightfoot, a structure in Council Bluffs, Iowa, and Hogsett and Lightfoot in Kansas City. Haskell asserts that this video would have shown that Hogsett was involved in one robbery and that this involvement would tend to show that Peoples was the shooter, since Peoples would be so upset that a co-robber had gone to the police that Peoples would have shot the victim himself rather than hire a gunman.

"We will not reverse a judgment on the basis of erroneous evidentiary rulings absent a showing that those rulings had a substantial influence on the jury's verdict." McPheeters, 427 F.3d at 1101. The video footage would not have introduced any new facts to the jury, which was already aware that Hogsett traveled to Omaha with Lightfoot when Lightfoot committed some of the robberies, so the exclusion of the video did not have a substantial influence on the jury's verdict.

## V.    THE JURY INSTRUCTIONS

### A.    Murder

Haskell asserts error in Jury Instruction Number 24, on the crime of murdering a federal witness. The instruction required that the jury find "that the killing was premeditated." The instruction went on to explain "[a] killing is premeditated when it is the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent."

We review for harmless error. United States v. Jacobs, 97 F.3d 275, 278 (8th Cir. 1996). The instructions must, as a whole, adequately advise the jury of the elements of the offense and the government's burden of proof. Id. The instruction correctly defined premeditation. Therefore, we conclude that this instruction on murder was adequate.

-11-

## B.    Conspiracy

Haskell asserts error in Jury Instruction Number 22.  He contends this instruction allowed the jury to agree that some overt act was done in furtherance of the conspiracy, but disagree as to which overt act.  The jury was given the following instruction on an overt act:

> It is not necessary that the government prove, beyond a reasonable doubt, that more than one act was done in furtherance of the conspiracy. It is sufficient if the government proves beyond a reasonable doubt, <u>one</u> such act; but in that event, in order to return a verdict of guilty, you must unanimously agree upon which act was done.

The instruction is clear that the jurors must be unanimous as to which act was done. We conclude that the instruction on overt acts required to prove conspiracy was adequate.

## VI.    POST-TRIAL MOTIONS

### A.    Brady Violation

Haskell moved for a new trial, arguing that the government violated his due process rights by failing to disclose that Hunter's attorney had contacted the United States Attorney's office and asked that Hunter be moved to a different jail because he was being harassed by another inmate, Donnie Porter.

In 2002, Porter was incarcerated with Hunter and Haskell.  On April 12, 2002, Porter gave a formal statement to law enforcement about the following statements made by Haskell:  Haskell made oblique references about the murder–complaining about not being paid, stating that he should have said no to Barfield, and revealing

details about the victim. The government reported Porter's proffer to Haskell prior to trial. The government found Porter's information cumulative and lacking in credibility, so Porter was not called as a witness at Haskell's trial. Prior to trial, Hunter complained to the government that Porter began trying to get better information by "sweating" Hunter and looking at Hunter's paperwork.

We review the district court's denial of Haskell's motion for a new trial for abuse of discretion. United States v. Parker, 267 F.3d 839, 846 (8th Cir. 2001). To warrant a new trial under Brady, Haskell must show

> (1) the evidence at issue is material and favorable to the defendant; (2) the evidence was suppressed by the government; and (3) the defendant was prejudiced by the suppression in that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

Id. (quotations omitted). Under the first prong, materiality is evaluated neither under a sufficiency of the evidence test nor by the mere possibility that it might have influenced the jury, but rather by how the government's case would have looked had the defense had access to the undisclosed information. United States v. Carman, 314 F.3d 321, 324 (8th Cir. 2002).

As the district court correctly noted in denying Haskell's motion, Hunter's complaints about Porter bothering him may have been useful to impeach Porter, had he testified at trial. However, Porter did not testify. Therefore, the evidence is not material because the government's case would have been the same even had the defense had access to the undisclosed information. Id. Because the evidence was not material, Haskell's motion for a new trial was correctly denied.

## B. Newly Discovered Evidence

On August 14, 2002, two months after Haskell's trial, Porter told his attorney that Hunter had sold Porter the information that Porter had intended to use to testify against Haskell. Porter's attorney contacted the government. The government interviewed Porter on September 18, 2002, and then informed Haskell's attorney on September 23, 2002. In addition to this post-trial information from Porter, Haskell learned of several other witnesses with allegations that Hunter was selling information to other inmates, and an evidentiary hearing was held concerning Haskell's motion for a new trial based on newly discovered evidence. Haskell hoped that the evidence would prove that Hunter, or possibly Peoples, was the real shooter, and Hunter had sold witnesses information with which to perjure themselves and receive reduced sentences for themselves.

At the hearing, Haskell called Caesar Vaca, a fellow inmate, who testified that Hunter had offered to sell him information about Haskell's case so that Vaca could testify in hopes of receiving a sentencing departure. Vaca also testified that Robert Henderson[4] had told Vaca that Hunter had given Henderson information to testify about threats Haskell made against Hunter. Vaca had seen Henderson and Hunter talking at one point. Vaca declined Hunter's offer and did not inform law enforcement of these interactions prior to Haskell's trial.

Ronnie Blade, another inmate, also testified that he overheard Hunter "coaching" Henderson while riding in a transport van. In September 2002, Blade contacted Haskell's counsel with this information, but had not informed anyone prior to that time.

---

[4]At Haskell's trial, Henderson testified that he had been in a holding tank with Haskell. Henderson testified that Haskell told Henderson to relate a message to Hunter that Hunter was a snitch and also threatened Hunter.

Porter testified at the hearing that he had given a statement to law enforcement agents about incriminating statements made by Haskell in April 2002, but was told that his testimony would not be used. After Haskell's trial, Porter contacted his attorney about his conversations with Hunter. Porter testified that he had transferred a vehicle from his family to Hunter's family. The car was payment for information to use in testimony, which Porter hoped would get him a more lenient sentence. Porter's girlfriend verified that the car had been transferred. Hunter denied the allegations about selling information and affirmed that the car was transferred, but that the car was payment for Porter's gambling debts. Porter claimed that he does not gamble.

We review the district court's denial of Haskell motion for a new trial based on newly discovered evidence for abuse of discretion. Parker, 267 F.3d at 846. To receive a new trial on this basis, Haskell

> must prove four factors to prevail: (1) the evidence must have been unknown or unavailable to the defendant at the time of trial; (2) the defendant must have been duly diligent in attempting to uncover it; (3) the newly discovered evidence must be material; and (4) the newly discovered evidence must be such that its emergence probably will result in an acquittal upon retrial.

Id.

The district court carefully analyzed the testimony from the evidentiary hearing in determining that Haskell had not met this burden. In particular, the court observed that the conversation Blade claimed to have overheard in the van occurred after Henderson had contacted law enforcement to report the threats made against Hunter, thus refuting Haskell's claim that this testimony was fabricated in the van. Further, Vaca's testimony was less helpful than Haskell advocated, because it neither contradicted Hunter's trial testimony nor indicated that Hunter was present at the murder, but rather primarily involved the alleged threats made against Hunter.

-15-

Finally, accepting that Porter purchased information from Hunter, Porter did not testify at trial and thus, did not have the opportunity to perjure himself.  Even had Porter testified, not with the information but about how he purportedly obtained it, the newly discovered scheme, rather than being material, was primarily relevant for impeachment.  United States v. Dogskin, 265 F.3d 682, 685 (8th Cir. 2001) (explaining that to meet the materiality requirement, evidence must be "more than merely cumulative or impeaching").  The district court did not abuse its discretion in denying Haskell's motion for a new trial based on newly discovered evidence.

## VII.  CONCLUSION

For the reasons stated above, we affirm the district court.

_____