# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1785

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Northern District of Iowa. |
| Terrence K. Gladney, also known | * |
| as D.J., | * |
| | * |
| Appellant. | * |

_____

Submitted: October 17, 2006
Filed: February 2, 2007

_____

Before WOLLMAN, RILEY, and GRUENDER, Circuit Judges.

_____

RILEY, Circuit Judge.

Terrence Gladney (Gladney) was charged with conspiracy to distribute crack cocaine and distribution of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)-(C), and 846. After trial commenced, and just before closing arguments, Gladney made an oral motion to dismiss the indictment, arguing the government's nineteen-month delay in bringing his federal indictment had resulted in a due process violation. The district court[1] declined to address the motion at that time and directed

---

[1] The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

Gladney to submit his motion in writing after trial. The jury convicted Gladney and, thereafter, the district court denied his motion to dismiss the indictment. Gladney appeals the district court's denial of his motion to dismiss. In addition, Gladney appeals the district court's refusal to give an addict-informer jury instruction. For the reasons stated below, we affirm.

## I.    BACKGROUND

On April 21, 2005, a grand jury returned a superseding indictment charging Gladney and co-defendant Sylvester Watkins (Watkins) with conspiracy to distribute crack cocaine and distribution of crack cocaine. At trial, John Saldivar (Saldivar), a confidential informant, testified Gladney and Watkins were engaged in a partnership to distribute crack cocaine in Cedar Rapids, Iowa. Saldivar testified Gladney sold him crack cocaine on August 12, 2003, and on September 11, 2003.

With respect to the August 12, 2003 sale, Special Agent Josh Lupkes (Agent Lupkes) and Investigator Anthony Robinson (Investigator Robinson), both with the Drug Enforcement Administration's Drug Task Force (DEA), testified Saldivar made a phone call to arrange the purchase of one-half ounce of crack cocaine from Gladney. Agent Lupkes and Investigator Robinson testified they searched Saldivar, provided him with pre-serialized currency, and equipped Saldivar with a transmitting device. Investigator Robinson testified Saldivar did not appear to be under the influence of any illegal substances during this or any other encounter he had with Saldivar.

Saldivar then met Gladney and Watkins at a parking lot where Saldivar entered their car. Saldivar testified once inside the car, Gladney and Watkins told him they had already sold the one-half ounce of crack cocaine they promised Saldivar. Thus, Gladney and Watkins sold Saldivar only one gram of crack cocaine for which Saldivar paid Watkins $100. Saldivar testified Gladney and Watkins told him they were leaving for Chicago to obtain more crack cocaine. Special Agent Greg Brugman (Agent Brugman), also with the DEA, testified he heard the conversation regarding

the trip to Chicago over the transmitting device as Agent Brugman was conducting surveillance of the drug transaction.

After the drug transaction, Gladney and Watkins drove away and DEA agents followed them for approximately twenty-five miles on Interstate 380 South. When Gladney and Watkins drove onto Interstate 80 East, Johnson County (Iowa), Deputy Chris Langenberg (Deputy Langenberg) stopped their vehicle. Investigator Robinson testified he requested the traffic stop by Deputy Langenberg in order to identify Gladney and Watkins.

During the traffic stop, Coralville, Iowa, Police Officer Maleah Droll (Officer Droll) assisted Deputy Langenberg. Neither Deputy Langenberg nor Officer Droll knew the details of the drug transaction, nor were they given the serial numbers of the currency used in the drug transaction. Deputy Langenberg conducted a canine search of the car, but did not find any drugs. Officer Droll testified the search was underway when she arrived and that she did not participate in the search of the car. Officer Droll, however, testified she conducted a pat-down for weapons on either Gladney or Watkins, but she could not remember which one.

With respect to the September 11, 2003 drug transaction, Saldivar testified he arranged to purchase one ounce of crack cocaine from Gladney. Saldivar placed a recorded call to Gladney from the DEA office. Again, Agent Lupkes and Investigator Robinson testified regarding the preparations for this drug transaction, i.e., searching Saldivar, giving Saldivar pre-serialized currency, and fitting Saldivar with a transmitting device.

For this drug transaction, Saldivar met Gladney in an alley where he entered a car with Illinois plates driven by Gladney. Gladney drove around the block, stopped the car, and handed Saldivar nineteen baggies of crack cocaine for which Saldivar paid Gladney $1,000.

During trial, Gladney asserted an alibi defense with regard to the events of September 11. Gladney called his girlfriend Shelneka Benton (Benton) to testify as to Gladney's whereabouts on that day. Benton testified Gladney was with her on the afternoon of September 11, paying a security deposit at Park Place Apartments in Portage, Indiana. Benton also testified that, after paying the security deposit, she and Gladney went to his parents' home.

Gladney also called Lori Smith (Smith), the manager of Park Place Apartments, as a witness. Smith testified a security deposit receipt for the Benton and Gladney apartment was written on September 11, 2003. The receipt was introduced into evidence. Smith testified the Park Place Apartments are comprised of 216 units, some of which have multiple tenants. Thus, Smith testified she did not know exactly who paid the security deposit on September 11, nor did Smith's paperwork indicate who made the payment.

After the first day of trial, Gladney filed a proposed jury instruction regarding the credibility of an addict-informer. The district court refused to use Gladney's proposed jury instruction in its final instructions. After two days of trial, and just before the jury was to enter the courtroom to hear closing arguments, Gladney made an oral motion to dismiss the indictment based upon pre-indictment delay. The district court declined to address the motion, and directed Gladney to submit his motion in writing after trial.

The jury convicted Gladney on the conspiracy and distribution charges,[2] and the district court denied Gladney's motion to dismiss the indictment. Gladney appeals the district court's denial of his motion to dismiss and the court's rejection of his proposed jury instruction regarding the credibility of an addict-informer.

---

[2] The jury, however, was unable to reach a verdict with respect to a third count charging Gladney with distribution of crack cocaine within 1,000 feet of a school. This charge was dismissed.

## II. DISCUSSION

### A. Motion to Dismiss the Indictment

Gladney argues the district court erred in denying his motion to dismiss the indictment based upon pre-indictment delay. We review the district court's denial of Gladney's motion to dismiss for clear error. United States v. Haskell, 468 F.3d 1064, 1070 (8th Cir. 2006). The Fifth Amendment's Due Process Clause protects a criminal defendant against unreasonable pre-indictment delay. Id. To prove a violation of his due process rights, Gladney must establish the delay resulted in actual and substantial prejudice to the presentation of the defense and the government intentionally delayed Gladney's indictment either to gain a tactical advantage or to harass him. Id. The court will inquire into the reasons for delay *only* where actual prejudice has been established. United States v. Sturdy, 207 F.3d 448, 452 (8th Cir. 2000). To establish actual prejudice, a defendant must identify witnesses or documents lost during the delay period. Id. However, actual prejudice cannot be established by defendant's speculative or conclusory claims of possible prejudice as a result of the passage of time. Id. The defendant carries the burden to show the lost testimony or information is not available through other means. Id.

The government contends the district court did not err in denying Gladney's motion to dismiss because his motion was untimely. We agree. Gladney had sufficient time to raise the pre-indictment delay issue earlier than he did. See United States v. Farmer, 312 F.3d 933, 936 (8th Cir. 2002). In Farmer, we found the defendant's claim of pre-indictment delay[3] made after trial had commenced was untimely; thus, we did not consider the merits of the claim. Id. Similarly, Gladney did not object to the delay until immediately before closing arguments. Gladney alleges he was unable to properly raise his motion earlier because he had to wait until the last witness concluded her testimony. However, Gladney does not indicate with

---

[3]We assume, without deciding, as did Farmer, 312 F.3d at 936, a delay in filing an indictment constitutes a defect in the indictment.

any degree of specificity what information or testimony prevented him from raising the delay issue until just prior to closing arguments.

As an alternative explanation for his delay, Gladney states he became aware of his alleged alibi witness, Smith, after the deadline for motions had passed; thus, he was unable to make his motion earlier. However, the record indicates Gladney filed motions to continue deadlines and, in fact, Gladney obtained a continuance based upon the discovery of his alleged alibi a few days before trial. Gladney could have raised the pre-indictment delay issue at that time or shortly thereafter. Gladney's argument that he had to wait until a few minutes before closing arguments, as his case was going to the jury, in order to raise the pre-indictment delay issue is without merit.

However, even if Gladney's delay could be considered timely, Gladney's motion still must be denied because he failed to establish any delay resulted in actual and substantial prejudice to the presentation of his defense. As previously stated, actual prejudice cannot be established by a defendant's speculative or conclusory claims of possible prejudice as a result of the passage of time. Sturdy, 207 F.3d at 452. Here, Gladney claims the passage of time prejudiced him because his witnesses were not able to recall events. Specifically, Gladney claims Officer Droll (the second officer who assisted in Gladney's traffic stop) and Smith (his alleged alibi witness) were unable to recall precisely their encounters with Gladney.

Gladney states the passage of time impaired Officer Droll's ability to remember whether she searched Gladney or found pre-serialized currency in Gladney's possession. However, Officer Droll testified that, although she could not remember which defendant she questioned in her patrol car, Officer Droll only conducted a pat-down for weapons, not a search. In addition, nothing in the record indicates Officer Droll knew any specific details of the drug transaction that took place prior to Gladney's traffic stop nor did Officer Droll know the serial numbers of the currency used in the drug transaction. Gladney's claim regarding Officer Droll's memory is without merit.

Gladney also states the passage of time impaired Smith's ability to remember who paid the security deposit on September 11, 2003. Gladney contends that, had the indictment been filed timely, Smith could have remembered Gladney and Benton were together when the deposit was paid. However, this claim is, at best, speculative and conclusory. Smith testified she manages 216 units at Park Place Apartments and some units have multiple tenants. To determine whether Smith would have been able to recall exactly who appeared to pay the security deposit that day is speculative. Gladney cannot establish actual prejudice based on such conjecture.

Furthermore, to establish prejudice, a defendant must show the missing testimony was not available through other sources. Id. Gladney presented the testimony of his girlfriend, Benton, who stated that on September 11, Gladney was with her at Park Place Apartments paying the security deposit. Here, Gladney presented the desired testimony through Benton, thus, actual prejudice cannot be established. See id.

The district court did not commit clear error in denying Gladney's motion to dismiss for pre-indictment delay.

### B.    Addict-Informer Jury Instruction

Gladney also argues the district court erred in rejecting his proposed addict-informer jury instruction. We disagree. We review a district court's rejection of a defendant's jury instruction for abuse of discretion. United States v. Davis, 237 F.3d 942, 945 (8th Cir. 2001).

This circuit has not adopted the rule that an addict-informer instruction must be given if requested. The need for such an instruction depends on the circumstances of each case. United States v. Dempewolf, 817 F.2d 1318, 1321 (8th Cir. 1987); see United States v. Gardner, 139 F. App'x. 762, 765 (8th Cir. 2005) (per curiam) (unpublished). The presence of any of the following factors may make an addict-

informer instruction unnecessary: (1) a dispute as to whether the informant is actually an addict, (2) cross-examination concerning the informant's addiction, (3) an instruction alerting the jury to view the informant's testimony with care, and (4) corroboration of the informant's testimony. Dempewolf, 817 F.2d at 1321.

Here, nothing in the record indicates Saldivar used drugs during the dates in question. In fact, Investigator Robinson testified Saldivar did not appear to be under the influence of illegal drugs at the time the drug transactions occurred. In addition, although Saldivar admitted to using cocaine "for like a day or two" while on probation and tested positive for cocaine on September 16, 2003, Saldivar denied using drugs on August 12 and September 11, 2003.

Furthermore, Gladney's counsel cross-examined Saldivar about his drug use. The district court told Gladney's counsel he could ask the jury to consider Saldivar's alleged drug use when evaluating Saldivar's memory. In addition, the district court instructed the jury that Saldivar had a cooperation agreement with the government, through which Saldivar received money and other benefits, and that Saldivar had prior convictions, which the jury could consider in deciding whether to believe Saldivar. Moreover, much of Saldivar's testimony was reinforced by the testimony of other government witnesses, namely, Agent Brugman, Agent Lupkes, and Investigator Robinson.

Based on this evidence, we conclude the district court did not abuse its discretion in refusing to give an addict-informer instruction.

## III.   CONCLUSION

Therefore, we affirm the judgment of the district court.

_____