**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**July 31, 2008**

**TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JOSEPH MILES DAVIS,

    Defendant-Appellant.

No. 07-2101
(D.C. No. 06-CR-0344-LH)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **TYMKOVICH**, and **GORSUCH**, Circuit Judges.

---

Joseph Miles Davis appeals his conviction and sentence on one count of conspiracy to distribute PCP. He challenges the district court's denial of (1) his motion to suppress certain evidence, (2) his motion for a mistrial after a witness referenced an inadmissible prior arrest, and (3) his request for a pattern jury instruction on drug-abuser credibility. We conclude that these arguments, along with a constitutional sentencing challenge that Davis presents only to preserve for

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

further review, are without merit.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm his conviction and sentence.

## I

## A

On February 2, 2006, Detective Joe Anzallo, a member of the Los Angeles Police Department's drug interdiction squad, patrolled the baggage claim area of Los Angeles International Airport.  With him was his partner, Detective Joe Alves.  Although both officers had badges and firearms, these items were concealed under their clothing.

While in the baggage area, the officers spotted Davis, who had just arrived on a flight from Las Vegas.  Davis was standing in the baggage claim area adjusting his pants, which were partially down, with the fly open and the belt unfastened.  Anzallo and Alves approached Davis and told him that he was not in trouble and not under arrest.  They then asked him why he was adjusting his pants and inquired about his travel plans.  After seeing that Davis had a black backpack on a chair nearby, Anzallo inquired if he was carrying a large amount of currency.  Davis admitted that he had about $5,000 with him.  The officers then asked if they could search Davis' bag.  According to Anzallo, Davis said that would be "okay" and "go ahead"; according to Davis, he said only, "[is] that your job?"  The entire conversation in the baggage area lasted less than four minutes.

Anzallo suggested to Davis that he follow the officers to the security office across the street. Davis agreed. According to Anzallo, Davis carried the backpack as he went to the security office with the officers.[1] Once inside the interview room, the officers searched the backpack and found a large amount of currency, which Davis then admitted was worth closer to $11,000. The room's door was open during the interview.

Davis explained that he had come to Las Vegas from Philadelphia earlier in the day, met a friend on the airplane, and won the money in a Las Vegas casino. Pressed on how he won so much money in such a short period, Davis stated that the cash was actually proceeds from the sale of his home, and he told the officers that he brought the money to Los Angeles to buy jewelry and clothing.

The backpack also contained travel itineraries. One indicated that Davis had paid for a man named Darlington Stewart to fly from Philadelphia to Las Vegas as the same time as Davis. Another disclosed that Davis had bought Stewart an Amtrak ticket to travel from Las Vegas back to Philadelphia a few days later. Davis did not object to the officers' inspecting these travel documents.

---

[1] In contrast, Davis stated that Alves carried the backpack to the security office. Following a suppression hearing, the district court credited the officers' version of events. Photographs from a surveillance camera later presented at Davis' trial confirmed that Davis, not the officers, carried the backpack.

The officers seized the currency and gave Davis a receipt. Based on the information in the travel itinerary, federal Drug Enforcement Administration ("DEA") agent David Smith boarded an Amtrak train in Albuquerque, New Mexico four days later. Smith found Stewart on the train and asked Stewart if he could search Stewart's luggage. Stewart agreed, and Smith discovered a prune juice bottle wrapped in Saran Wrap in one of Stewart's bags. Suspecting that the bottle contained contraband, Smith arrested Stewart. A field test of the bottle revealed that it contained phencyclidine ("PCP").[2]

Stewart eventually pleaded guilty to conspiracy to distribute PCP. When he later testified at Davis' trial, Stewart explained that he was a disc jockey who had toured with Davis's hip-hop group for several years. At one point, Stewart found himself in need of money and asked Davis for a loan. Davis instead offered to bring Stewart along on a drug run to Los Angeles, for which he promised to pay Stewart $200 or more. The two flew to Las Vegas, and Davis traveled on to Los Angeles while Stewart stayed behind. Davis called Stewart from Los Angeles to tell him that he had hit a "bump in the road," but returned back to Las Vegas where he gave Stewart the juice bottle containing PCP. At that point, Davis told Stewart of his encounter in the airport with the police. Stewart, with the drugs in

---

[2] In the DEA's estimation, the bottle contained approximately 1,200 doses of PCP.

his backpack, boarded an Amtrak train bound to Philadelphia, which was then intercepted by Smith in Albuquerque.

**B**

A federal grand jury indicted Davis on one count of conspiracy to possess with intent to distribute 10 grams or more of PCP, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846. The government also filed an information stating that Davis had a previous conviction for felony drug possession and that it would seek a mandatory minimum of 10 years' imprisonment pursuant to § 841(b)(1)(B).

Prior to trial, Davis moved to suppress evidence recovered during the search of his bag at the airport. He argued that he did not freely consent to the search because he only told the officer to "do what [the officer's] job was," and was "detained in a space near the baggage claim, and was pressured, drilled, and cornered." The district court held a suppression hearing, during which Anzallo and Davis each recounted their versions of events. The court then heard argument on the motion. Davis' counsel contended that "what started as a consensual encounter eventually evolved into something more intrusive, more sinister." Relying on Davis' version of events—that the officers had taken control of his backpack at the airport—counsel stated that Davis "could have walked away, but as a practical matter, he could not, because [the backpack] had his ID, the backpack had his credit cards, it had everything that he needs to get around." She

then emphasized that once Davis went to the interview room, he was in a police-dominated environment. Although Davis' counsel stated that she "must concede [that the seizure] was consensual at the very beginning," she argued that "it . . . evolve[d] into a more coercive encounter." Counsel also insisted that Davis responded to Anzallo's request for consent by saying "if that is your job," rather than giving an explicit "okay" as Anzallo had testified.

Fully crediting the officers' version of events, the district court denied the motion to suppress. It stated:

> I have to conclude that the defendant's testimony is not credible, and . . . that the officers' testimony is credible. . . . I think the issue of whether he consented has to be decided at the time of the two or three minutes in the terminal, and I conclude that during that period of time he consented. I accept the police officers' testimony that he said "okay" or "go ahead." And nothing that he did or testified about yesterday leads me to conclude that he withdrew that consent at any point in time.

Also prior to trial, the government filed a motion to introduce evidence under Federal Rule of Evidence 404(b) of Davis' 1996 federal conviction for felony possession of PCP with intent to distribute. The district court denied the motion, ordering that the government could not introduce evidence of the prior conviction.

The case proceeded to trial. In addition to testimony from Stewart, Anzallo, and other government agents, the government presented details regarding the financial aspects of the drug conspiracy, including bank records, telephone

-6-

records, and information from Davis' girlfriend's computer. Alves, Anzallo's partner, also testified at the trial. During cross-examination, he alluded to reviewing a report about Davis in addition to the report that his partner had written. Responding to followup questions from Davis' counsel, Alves stated that the report related to Davis' arrest in Philadelphia ten years earlier. The jury did not hear any details about the arrest, but Davis' counsel immediately objected and moved for a mistrial. The district court denied the motion, instructing the jury that the previous arrest was irrelevant.

After the government rested, Davis presented the testimony of Chenjerai Kumanyika, a member of Davis' hip-hop group. He toured with both Davis and Stewart and testified to impeach Stewart's character. He stated that Stewart was "antisocial" and explained that Stewart often stayed in his hotel room drinking and smoking marijuana. This testimony led Davis to request a pattern jury instruction regarding the credibility of drug abusers, but the court refused to give the proposed instruction. After deliberation, the jury returned a verdict of guilty.

Following Davis' conviction, the probation office prepared a Presentence Investigation Report ("PSR"), which classified Davis as a career offender under U.S.S.G. § 4B1.1(a). The PSR calculated a total offense level of 37 and placed Davis' criminal history category at VI, based in part on the career-offender classification. These calculations resulted in an advisory United States Sentencing Guidelines ("Guidelines") range of 360 months' to life imprisonment.

After considering the factors in 18 U.S.C. § 3553(a), the district court varied downward and sentenced Davis to 210 months' imprisonment and eight years' supervised release.

## II

### A

Davis challenges the denial of his motion to suppress, but on slightly different grounds than he raised in the district court. Before the district court, Davis' trial counsel contended that although the questioning may have been consensual at the outset, Davis did not give explicit verbal consent for the search, and was not actually free to leave because one of the officers had taken possession of his backpack. On appeal, Davis does not quarrel with the district court's factual findings that Davis said "okay" when asked whether he would consent to a search, or with the court's decision to credit testimony that Davis retained possession of the backpack in the airport. Instead, Davis' main argument is "an issue of first impression in this Circuit and perhaps in any Circuit, that is, the effect of the post-9/11 security environment on the voluntariness of police encounters and baggage searches in airports." In other words, Davis contends that as a rule, airports are now such inherently coercive environments that even if Davis consented to police questioning and the subsequent search, he was legally incapable of doing so on account of his surroundings.

Davis has arguably forfeited this argument by failing to raise it squarely before the district court. See United States v. Dewitt, 946 F.2d 1497, 1502 (10th Cir. 1991); United States v. Orr, 864 F.2d 1505, 1508 (10th Cir. 1988). Davis contends that while he has presented a new theory on appeal, that new theory is in support of the same argument that was raised below, so we may address it. Whether conceived as a new argument or a new theory in support of an existing argument, we are only equipped to consider matters for which the factual record is sufficiently developed to allow us to do so. See United States v. Hernandez-Rodriguez, 352 F.3d 1325, 1328 (10th Cir. 2003). In this case, there is nothing in the record regarding the effect the post-9-11 airport security has had on passengers' willingness to consent to search. Without such a record, we would be forced to decide the issue in this case based on speculation or our own personal experiences with post 9-11 airport security—an inappropriate task for an appellate court. Accordingly, we will only consider Davis's reasoning on appeal to the extent that it overlaps with arguments presented to the district court.[3]

---

[3] The government suggests that Davis not only forfeited his challenge to the suppression ruling by not raising it below, but affirmatively waived it, in which case we would decline to review this issue even for plain error. See United States v. Teague, 443 F.3d 1310, 1314 (10th Cir. 2006). The record reveals that Davis has indeed waived one line of reasoning: He contends that his initial "detention" in the airport was not supported by reasonable suspicion. But trial counsel affirmatively conceded at the suppression hearing that the officers' questioning was consensual at the outset and, therefore, reasonable suspicion was not required to initiate questioning. As to his remaining contentions, Davis' arguments in the trial court do not so clearly controvert his reasoning on appeal that we may comfortably apply the waiver doctrine.

Davis contends that he was "seized" at the moment officers began questioning him, and that this seizure rendered his subsequent conduct and consent to the search of his bag involuntary. His "post-9/11" argument is in essence one of coercion, specifically that the airport, combined with the officers' actions, was so inherently coercive that he could not have voluntarily consented to the encounter and the search.

"A consensual encounter is not a seizure for purposes of the Fourth Amendment." United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005). In evaluating whether an encounter is consensual, we have considered

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

Id. (quoting United States v. Zapata, 997 F.2d 751, 756-57 (10th Cir. 1993)). These factors almost uniformly indicate a consensual encounter. The officers approached Davis in a public area and asked him questions to which he calmly responded. They were wearing plain clothes, and their weapons were not visible during the discussion. To the extent that Davis intimates that heightened security protocols intimidated him into consenting, this argument is particularly weak

-10-

considering that Davis was not in a secure area of the airport but rather in the baggage claim area. It is true that the officers did not explicitly advise Davis that he could walk away at any time, but they did plainly tell him that he was not under arrest. Moreover, "[a]n explicit advisement . . . is not a requirement; it is merely a factor to be considered in the totality of the circumstances." Spence, 397 F.3d at 1284 (quotation omitted).

The same is true for Davis' consent to a bag search after he followed the officers across the street to the security office. "In determining whether a consent to search was free from coercion, a court should consider, inter alia, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances." United States v. Pena, 143 F.3d 1363, 1367 (10th Cir. 1998) (quotation omitted). None of these factors were present in the security office. The door of the office was open for most of the interview and search, and the officers never laid hands on Davis, or made any promises. In addition, the district court found that Davis continuously maintained possession of his bag until it was searched, and that he was thus physically free to leave with his belongings at any time. Regarding his mental condition, Davis does not contest the district court's factual findings that Davis was intelligent. In short, because Davis' consent to the search of his bag lacked a single coercive element, we find no error in the district court's denial of his

motion to suppress.  Furthermore, because Davis has not shown that his initial

encounter with police violated the Fourth Amendment, the search that followed

was not automatically the product of an illegal seizure, but was instead properly

supported by Davis' continued consent.

**B**

Davis next appeals the district court's refusal to grant a mistrial after Alves

alluded to Davis' prior arrest.  We review the district court's ruling for abuse of

discretion.  United States v. Gwathney, 465 F.3d 1133, 1144 (10th Cir. 2006).

"In determining whether a new trial is required after a witness offers improper

information, we consider (1) whether the prosecutor acted in bad faith, (2)

whether the district court limited the effect of the improper statement through its

instructions to the jury, and (3) whether the improper remark was inconsequential

in light of the other evidence of the defendant's guilt."[4]  United States v. Lamy,

521 F.3d 1257, 1266 (10th Cir. 2008) (quotation omitted).

On the first factor, there was unquestionably no evidence of prosecutorial

bad faith.  In fact, the incriminating statement was made in response to repeated

questions from Davis' own attorney, and the court denied Davis' motion on the

basis that Davis "absolutely invited" the error.  The full exchange between Alves

and Davis' counsel reveals that this conclusion was not an abuse of discretion:

---

[4] The government does not contend that the testimony about Davis'
Philadelphia arrest was admissible, so we assume that it qualifies as "improper
information."

-12-

Q:      Have you read the reports concerning this particular case?

A:      I have reviewed the report my partner wrote.

Q:      Okay.  Other than the two or three-page report that your partner wrote, have you reviewed any other documents?

A:      I reviewed another report.

Q:      Okay.  What other report?

A:      Concerning Mr. Davis' arrest in Philadelphia approximately 10 years ago.

Davis was not entitled to a mistrial based on the witness' straightforward answer to his repeated questioning about the additional report.  As to the second factor, the trial court issued a curative jury instruction.  This instruction was more than adequate to cure any prejudice that might have resulted from an inconsequential statement:  the witness' reference to a decade-old arrest.  The district court did not abuse its discretion in denying a mistrial.

## C

Davis next maintains that the district court erroneously refused to instruct the jury about the effects of drug abuse on witness credibility.  We review the court's refusal to give a specific instruction for abuse of discretion.  United States v. Moran, 503 F.3d 1135, 1146 (10th Cir. 2007).  In evaluating the court's exercise of discretion, we review the jury instructions given de novo, "to determine whether, as a whole, they accurately state the governing law."  Id. (quotation omitted).

-13-

Davis' requested jury instruction related to the testimony of defense witness Kumanyika, who along with Stewart, toured in Davis' hip-hop group over a period of about five years. Kumanyika explained that when he toured with Stewart, Stewart was

> like very sort of like antisocial. I mean, you know, he wasn't like an unpleasant person, but he would like stay basically and drink and just get high in his hotel, you know, with marijuana, I'm talking about, primarily, which is a big thing, but nobody in our group did that. He wouldn't go out. He would just be in the hotel all the time which was noteworthy to me because he had opportunity to make these connections, and he would be in his room getting high.

Davis requested that the trial court give Tenth Circuit Pattern Jury Instruction 1.16, which cautions a jury that

> [t]he testimony of a drug abuser must be examined and weighed by the jury with greater caution than the testimony of a witness who does not abuse drugs.

> [Name of witness] may be considered to be an abuser of drugs.

> You must determine whether the testimony of that witness has been affected by the use of drugs or the need for drugs.

The district court refused to give the instruction because it "d[id]n't believe the evidence reflects anything other than an isolated comment that the individual had been observed on one occasion smoking pot. There is no evidence that he is a substance abuser."

Rather than suggesting that Stewart used drugs on one occasion, Kumanyika testified that over the course of several years of touring together,

Stewart would stay in his hotel room "all the time" getting high. Nonetheless, we cannot conclude that it was an abuse of discretion for the court to refuse to give the instruction. While the drug abuser instruction should generally be given when a known drug abuser testifies, see United States v. Smith, 692 F.2d 658, 661 (10th Cir. 1982), evidence of drug abuse at some point in the witness's past does not necessarily establish that the witness should still considered to be an abuser of drugs such that the instruction should be given. See United States v. Halverson, 973 F.2d 1415, 1417 (8th Cir. 1992) (holding that district court did not err when the only evidence of witness's addiction to drugs dated to a time prior to the trial); United States v. Hoffman, 957 F.2d 296, 299 (7th Cir. 1992) (holding that district court did not err in refusing to give addict instruction because, among other things, it was not established that witness was a drug addict at the time of trial).

In our case, Kumanyika only testified to Stewart's drug usage during the period of time in which they were traveling together, two years before the events in question in this case and well before trial. Nothing in his testimony suggests that Stewart was abusing drugs at the time of the events of the case or at the time of the trial. Moreover, Kumanyika never explicitly testified that Stewart was a drug abuser, and despite having the opportunity, Davis' counsel did not press Kumanyika on the point. In these circumstances, we cannot say it was an abuse of discretion for the district court to refuse to give the drug abuser instruction. See United States v. Tousant, 619 F.2d 810, 812 (9th Cir. 1980) ("Where the fact

of addiction is not clear and where the district court has not precluded the defendant from establishing it, it is not error to reject an instruction on drug addiction.").

In any event, the district court instructed the jury on how to evaluate a witness' credibility, and noted that as a cooperating witness, Stewart's testimony should be viewed "with great care." These instructions were adequate to inform the jury that it should use its common sense to evaluate Stewart's credibility before accepting his testimony and therefore correctly stated the governing law. See United States v. Bamberg, 478 F.3d 934, 940 (8th Cir. 2007); United States v. Gladney, 474 F.3d 1027, 1032 (8th Cir. 2007); United States v. Franklin, 415 F.3d 537, 553-54 (10th Cir. 2005).

### III

Finally, Davis maintains that the federal courts' application of the advisory Guidelines after United States v. Booker, 543 U.S. 220 (2005), is a "de facto" violation of the Fifth and Sixth Amendments. The Booker remedy has been consistently applied by the Supreme Court, most recently in Kimbrough v. United States, 128 S. Ct. 558 (2007), and Gall v. United States, 128 S. Ct. 586 (2007), and remains controlling law.[5] As Davis concedes, this argument is foreclosed by binding precedent.

---

[5] This case is a peculiar vehicle for such a challenge, given that the district court imposed a sentence significantly lower than what the Guidelines advised.

## IV

Davis' conviction and sentence are **AFFIRMED**.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge