# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3969

_____

United States of America,               *
                                      *
         Appellee,           *
                                      *    Appeal from the United States
      v.                    *    District Court for the
                                      *    Western District of Missouri.
Juan Delgado,               *
                                      *
         Appellant.         *

_____

Submitted: March 18, 2011
Filed: September 2, 2011

_____

Before RILEY, Chief Judge, LOKEN and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted Juan Delgado of one count of conspiring to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, four counts of distribution of less than five hundred grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), one count of conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i)-(ii), 1956(h), and 1957, and four counts of money laundering, in

violation of 18 U.S.C. §§ 1956(a)(1)(B)(i)-(ii) and 2.  The district court[1] sentenced him to 360 months' imprisonment on count one, and 240 months' imprisonment on each of the other counts, with the terms to run concurrently.  Delgado appeals his conviction, arguing that there was a prejudicial variance between the indictment and the evidence presented at trial.  He also asserts that there was insufficient evidence to sustain his convictions for distribution of cocaine, conspiracy to commit money laundering, and money laundering.  We affirm.

I.

In 2005, state and federal law enforcement began an investigation of suspicious financial transactions and cocaine distribution involving Delgado and the Super Pollo restaurant, an establishment in Kansas City, Missouri, owned by Delgado and his wife, Sylvia Delgado.  The investigation resulted in a nineteen-count indictment, charging Delgado and eleven others with conspiracy to distribute cocaine, Delgado and five others with conspiracy to launder money, and Delgado with distribution of cocaine and money laundering.  The case proceeded to trial against four defendants: Delgado, Sylvia Delgado, Luis Morgan, and Omar Villareal.

Viewed in the light most favorable to the jury's verdict, the evidence at trial revealed that Delgado and twelve coconspirators engaged in a large-scale cocaine distribution scheme from 2002 through 2007.  Fernando Chavez, a resident of Juarez, Mexico, was the cocaine supplier for the conspiracy.  The distribution followed a general pattern:  Chavez distributed cocaine to Delgado and coconspirator Jose Estrada, who then distributed it to other conspirators for sale in and around Kansas City.

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

Between January and September 2006, a confidential informant and undercover Detective William Corbin made four separate purchases of powder cocaine from Delgado, totaling approximately one kilogram. Three of the four purchases were recorded on audiotape; one was also recorded on videotape. After the purchases, officers obtained seven orders authorizing interception of communications through wiretap. The wiretaps were ordered for three of Delgado's telephones, and one telephone each for coconspirators Estrada, Chavez, Villareal, and Raymond Sparks. At trial, the government played over forty recorded telephone conversations, and coconspirators Cruz Santa-Anna, Jose Canales, and Sparks testified about details of the recorded conversations. Several officers also testified about telephone calls intercepted pursuant to the wiretaps, including calls that led them to conduct surveillance of suspected drug transactions. This surveillance resulted in evidence that implicated Estrada, Carlos Hernandez, Santa-Anna, and Jose Ortega-Gallagos in drug transactions.

On August 27, 2006, a U.S. Border Patrol agent near the Mexican border stopped to assist Estrada, who appeared to be a stranded motorist. The agent obtained consent to search Estrada's vehicle and found approximately $460,000 in cash and a "drug ledger" inside of a hidden compartment. The drug ledger listed the nicknames of Sparks, Estrada, and Delgado next to numerical figures.

On April 10, 2007, officers executed a search warrant on Delgado's residence. During the search, police found approximately $140,000 in U.S. currency, some of it wrapped in cellophane and hidden in various locations, including behind a false wall. Officers also found a semi-automatic handgun, a small amount of cocaine, and a money counter.

Sparks and Santa-Anna testified for the government as cooperating witnesses. Sparks testified that he dealt cocaine with Morgan, but when Morgan went to jail, he introduced Sparks to Delgado and Villareal. Sparks stated that between October 2006

and March 2007, he purchased cocaine from Delgado and Villareal for resale to other individuals, including coconspirators.  Santa-Anna testified that he bought cocaine from Delgado from 2001 until 2003, and that he met Villareal through Delgado.  He explained that he eventually began to buy directly from Villareal, who was obtaining the cocaine from Delgado.  He testified that around 2005, he began buying cocaine from Estrada, who obtained it directly from Chavez, because Estrada was selling it at a cheaper price than Delgado.

The money laundering charges involved four real estate transactions: Delgado's purchase of 328 Lawndale, Kansas City, Missouri; Delgado's purchase of two tracts of real estate from Canales, Hastain Acres and El Lago Lodges; and the purchase of 412 North Chelsea Avenue, Kansas City, Missouri, by Santadelg Properties, LLC ("Santadelg"), a company formed by Sylvia Delgado.  The government presented testimony about these transactions from several witnesses, including an Internal Revenue Service ("IRS") agent, a Drug Enforcement Administration ("DEA") financial investigator, bank and closing company employees, Santa-Anna, and Canales.  The government corroborated this testimony with financial records, property records, and recorded phone conversations.

DEA Financial Investigator Robert Hawkins testified that if a person purchases monetary instruments, including cashier's checks and money orders, totaling $10,000 or more, there is a federal reporting requirement.  He explained that the seller of the instrument is required to fill out a currency transactions report, which contains information about the purchaser, including the person's name, date of birth, address, and Social Security number.  The report is sent from the seller to the federal government.  Hawkins testified that, in layman's terms, money laundering occurs when an individual conducts a financial transaction with illegal proceeds in a way that attempts to make the money look like something other than illegal proceeds.

The government produced testimony that explained what occurs generally at a real estate closing transaction conducted by a closing company. After determining the contract sales prices and the amount needed to pay off debt owed on the property, such as liens and judgments, and the closing costs (costs charged by the closing company for the services it provides), the company prepares an accounting, set forth in closing statement, of what each person must pay to effectuate the sale. At a closing, the seller and buyer provide funds equal to the amount that the statement reflects each party owes to complete the transaction. An employee from the company then fills out a deposit slip for any financial instruments and cash used by the parties. An employee also makes copies of the instruments and cash used in the transaction.

The first transaction at issue involved Delgado's purchase of the Lawndale property on September 15, 2003. On this date, Delgado purchased with cash two cashier's checks for $7500 and $7797.10. Delgado made the two purchases within a few hours of each other from separate banks in which he did not have an account. At the time, Delgado had a personal bank account at a third bank with over $150,000 of available funds. Delgado used the cashier's checks at the closing to purchase the property.

On October 5, 2005, Delgado purchased the Hastain Acres property from Canales. The documented sales price of the property was $110,000. At the closing, Canales brought fifteen cashier's checks and money orders, along with $4000.67 in cash, to pay approximately $47,000 that he owed for the existing mortgage, federal tax liens, and closing costs. Delgado and Canales purchased eleven of the fifteen cashier's checks and money orders on October 4 and 5, 2005, from seven different locations. These eleven cashier's checks and money orders totaled approximately $40,000, and each was for an amount under the $10,000 federal reporting requirement. Delgado provided the funds for the purchase of these cashier's checks and money orders, and Delgado retrieved part of the cash used in the purchases from a slit-open tire located in the trunk of Delgado's vehicle.

To pay the amount Delgado owed for the transaction, Delgado brought a cashier's check for $59,750.20, and financed the remainder by executing a deed of trust to Canales for $50,000. A deed of trust is recorded in the property records, and here, it established that Delgado owed Canales $50,000 and that the debt was secured by Hastain Acres. Delgado satisfied the deed of trust later that day by paying Canales $30,000 cash and forgiving a previous loan of $20,000. Canales explained that neither party reported that the deed of trust had been satisfied, because they intended to report that Delgado had made $2000 payments to Canales each month until the deed of trust had been satisfied, rather than try to explain the sudden appearance of $30,000 in cash. Delgado had Canales sign predated receipts for each month's "payment."

IRS Special Agent Jeff Thomas testified that around the time of the Hastain Acres transaction, Delgado's deposits into his bank accounts, including a bank account owned by the Super Pollo restaurant, remained consistent and that the total amount of cash withdrawn from the accounts for the entire year of 2005 was $27,400. He found this significant, because the amount withdrawn was much lower than the approximately $40,000 in cash that Delgado converted into the eleven cashier's checks and money orders on October 4 and 5, and lower than the $30,000 cash payment to Canales after the Hastain Acres transaction closed. He further explained that based on his review of Delgado's bank and IRS records, Delgado did not have a known source of income that would support the large cash transactions.

Delgado purchased the El Lago Lodges property from Canales on May 30, 2006. Delgado and Canales listed the contract sales price of the property as $28,340.25 on the closing documents. Delgado and Canales previously agreed, however, that the actual sales price would be $38,340.25, and that Delgado would pay Canales the extra $10,000 in cash after the closing. At the closing, Delgado paid $19,073.50, using, *inter alia*, three money orders totaling $2800 purchased by Sylvia Delgado and two cashier's checks that had been purchased by Walter Grigsby. Grigsby testified that on May 5, 2006, a co-worker at Kansas City Title Loan, whose

connection to the Delgados was not established at trial, gave him $15,000 cash to purchase two cashier's checks for $7500 each, payable to Juan and Sylvia Delgado. He stated that he did not know the reason his co-worker wanted the checks. Canales brought to the closing $10,200 in cash to satisfy debt on the property. Per a prior agreement between Delgado and Canales, however, Delgado was actually responsible for paying these costs. Delgado asked Canales to pay the costs at the closing, and in return, Delgado agreed later to repay Canales in cash. After the closing was complete, the parties entered Delgado's vehicle and Sylvia Delgado retrieved $20,000 in cash from behind a door panel. Of this amount, Delgado paid Canales $10,000 to repay him for his contribution at the closing and $10,000 to satisfy their actual agreed upon price. As a result, Delgado was able to use $20,000 in unrecorded and unreported cash in the transaction.

Agent Thomas testified that during 2006, Delgado's deposits into his bank accounts remained consistent, and that leading up to the sale of El Lago Lodges, his total amount of cash withdrawals was $16,701. Agent Thomas explained that Delgado did not make a significant withdrawal that would match the large amount of cash that he secretly paid to Canales in the El Lago Lodges transaction.

On October 20, 2006, Santa-Anna transferred his North Chelsea residence to Santadelg pursuant to an agreement with Delgado and Chavez. Sylvia Delgado, Santa-Anna's sister, had formed Santadelg three days earlier. In exchange for Santadelg receiving the property, Delgado paid Chavez $72,000 to satisfy a drug debt that Santa-Anna owed Chavez. Santa-Anna testified that to facilitate the transaction, Delgado gave Santa-Anna money orders and cashier's checks to pay off the approximately $10,000 mortgage that Santa-Anna owed on the house. Santa-Anna did not explain why Delgado requested that Santa-Anna transfer the property to Santadelg. Investigator Hawkins testified that buying property in the name of a company, as opposed to an individual, removes the buyer one step from the cash used in the transaction.

The jury found Delgado guilty on one count of conspiracy to distribute cocaine, four counts of unlawful distribution of cocaine, one count of conspiracy to launder money, and four substantive counts of money laundering. The court forfeited Delgado's interest in the properties listed in the indictment and returned a money judgment against him for $2,327,090. The district court sentenced Delgado to 360 months' imprisonment on the conspiracy to distribute count, and 240 months' imprisonment on each of the other nine counts, with the terms to run concurrently.

II.

Delgado contends that his conviction for conspiracy to distribute cocaine must be reversed, because there was a prejudicial variance between the indictment and the evidence at trial. The indictment charged a single conspiracy, while Delgado contends that the evidence showed three to six separate conspiracies. Because Delgado did not raise this argument in the district court, we review his claim for plain error. *See United States v. Buckley*, 525 F.3d 629, 633 (8th Cir. 2008). To establish plain error, Delgado must show that the district court committed an error that is plain, *i.e.*, clear under current law, that he was prejudiced by the error, and that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993).

"A single conspiracy is composed of individuals sharing common purposes or objectives under one general agreement." *United States v. Maza*, 93 F.3d 1390, 1398 (8th Cir. 1996) (internal quotations omitted). In evaluating whether a variance occurred, we look to the totality of the circumstances and give the verdict the benefit of all reasonable inferences that can be drawn from the evidence. *United States v. McGilberry*, 620 F.3d 880, 885 (8th Cir. 2010). A variance based on multiple conspiracies justifies reversal only if a "spillover" of evidence from one conspiracy to another prejudices the defendant's substantial rights. *United States v. Hall*, 171 F.3d 1133, 1150 (8th Cir. 1999).

Delgado claims that the evidence established multiple conspiracies because the participants in the transactions varied and the conspirators did not have a common goal. He points to evidence that Sparks began purchasing cocaine from Estrada because he supplied it at a cheaper price. "[A] single overall conspiracy," however, "can be made up of a number of separate transactions and of a number of groups involved in separate crimes or acts." *McGilberry*, 620 F.3d at 885-86 (internal quotations omitted). Here, the evidence established a single overarching conspiracy to import cocaine from Mexico and distribute it for profit in and around the Kansas City area.

The government produced evidence of significant overlap and connection between the conspirators. That various conspirators join at different times, change roles, or depart from the conspiracy does not convert a single conspiracy into multiple ones. *See Maza*, 93 F.3d at 1398-99. And "[t]he fact that [Delgado] may have competed with some of his coconspirators did not defeat the prosecution's theory that they were all members of a single conspiracy." *United States v. Jeffers*, 570 F.3d 557, 568 (4th Cir. 2009). The evidence raised a reasonable inference that Delgado and Estrada worked together. This evidence included recorded phone conversations between Delgado and Estrada discussing transactions, and a drug ledger – found with $460,000 cash in Estrada's vehicle – that listed the nicknames of Sparks, Estrada, and Delgado next to numerical figures. The trial record supports a finding of a single conspiracy, and Delgado has therefore failed to establish plain error.

Delgado also cannot establish prejudice from the government's presentation of evidence. When the evidence shows that a defendant is a member of multiple conspiracies, the danger of prejudice from spillover of those conspiracies is minimal at best. *See United States v. Jones*, 880 F.2d 55, 66 (8th Cir. 1989). Of the six conspiracies that Delgado contends were proved at trial, Delgado acknowledges that he was a member of three and that a fourth "transcended" into a fifth conspiracy in which he was a member. As to the sixth alleged conspiracy, in which Delgado claims

he was not involved, there was little danger of prejudice, because the evidence was relatively simple for a jury to compartmentalize, and the jury was instructed that "merely being present at the scene of an event, or merely acting in the same way as others or merely associating with others, does not prove that a person has joined in an agreement or understanding." R. Doc. 368, at 29; *see United States v. Hall*, 171 F.3d 1133, 1150 (8th Cir. 1999); *United States v. Jagim*, 978 F.2d 1032, 1041 (8th Cir. 1992). The purported separate drug distribution conspiracy did not involve complicated or confusing transactions, and a reasonable jury following the court's instructions likely could compartmentalize the evidence against Delgado and distinguish it from any separate conspiracy in which he was not involved. Thus, Delgado suffered no prejudice, even assuming the evidence suggested multiple conspiracies.

## III.

Delgado also contends that the evidence was insufficient to support his convictions for distribution of cocaine, conspiracy to commit money laundering, and money laundering. In considering the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict and will overturn a verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Wilder*, 597 F.3d 936, 943 (8th Cir.), *cert. denied*, 131 S. Ct. 169 (2010).

On the drug distribution counts, there was abundant evidence of guilt. A detective testified that he purchased cocaine directly from Delgado. A surveillance officer provided corroborating information, and three of the transactions were recorded on audio or video. In the face of this overwhelming evidence of guilt, there is no basis to set aside the convictions.

-10-

To convict Delgado of money laundering, the government was required to prove that he engaged knowingly in transactions involving the proceeds of unlawful distribution of cocaine, with the intent (1) to conceal the nature, location, source, ownership, or control of the illegal proceeds, or (2) to avoid a federal or state transaction reporting requirement. 18 U.S.C. § 1956(a)(1)(B). A conspiracy conviction requires proof that the defendant "knowingly joined a conspiracy to launder money and that one of the conspirators committed an overt act in furtherance of that conspiracy." *United States v. Pizano*, 421 F.3d 707, 725 (8th Cir. 2005) (internal quotations omitted). For a conspiracy to exist, there must be an agreement to achieve an illegal purpose. *Id.* at 725-26. The agreement need not be formal, and "the government may prove the agreement wholly by circumstantial evidence or by inference from the actions of the parties." *Id.* at 726 (internal quotation omitted).

The jury convicted Delgado of four counts of money laundering, one each based on the Hastain Acres, Lawndale, El Lago Lodges, and North Chelsea transactions. The jury found that Delgado committed money laundering by acting with intent to avoid a federal reporting requirement in the Hastain Acres and Lawndale transactions, and Delgado does not challenge these findings on appeal. The jury also found that Delgado acted with intent to conceal the nature, location, source, ownership, or control of unlawful proceeds in the El Lago Lodges, North Chelsea, and Lawndale transactions.

Delgado challenges all four counts on the ground that the government failed to prove that he used unlawful proceeds in the transactions, and that he intended to conceal his identity in the transactions. The government presented evidence that Delgado received profits from his cocaine distribution, had large amounts of unexplained and hidden cash, and used the cash in a way that avoided leaving records. This was sufficient to allow the jury to infer that he used unlawful proceeds in the transactions at issue. Delgado's identity argument is without merit, because the money laundering statute does not require an intent to conceal the launderer's identity.

-11-

*See* 18 U.S.C. § 1956(a)(1); *United States v. Spencer*, 592 F.3d 866, 880 (8th Cir. 2010).

The government also produced sufficient evidence for a reasonable jury to conclude that Delgado acted with intent to conceal the illegal nature or source of the funds used in the El Lago Lodges and North Chelsea transactions.[2]  To facilitate the El Lago Lodges transaction, Delgado used cashier's checks and money orders that were purchased by various people in numerous locations, all for amounts under a $10,000 federal reporting requirement.  *See* 31 C.F.R. § 103.22(b)(1) (2007) (current version at 31 C.F.R. § 1010.311).  This was enough for the jury to infer that he acted with intent to conceal the illegal source of the funds.  *See United States v. Williams*, 605 F.3d 556, 566 (8th Cir. 2010).  The government produced further evidence that Delgado structured the transaction to conceal the illegal source of large amounts of cash that he used to finance the transaction.  This includes evidence that Delgado made an unrecorded and unreported cash payment of $10,000 to Canales after listing an artificially low sales price in the transaction documents, and that Delgado made an unrecorded and unreported cash payment of $10,000 to Canales to reimburse Canales for paying a portion of Delgado's costs at the closing.

To facilitate the North Chelsea transaction, Delgado gave Santa-Anna cashier's checks and money orders to pay off the approximately $10,000 mortgage Santa-Anna owed on the property.  The government also produced evidence that Santa-Anna signed over his North Chelsea residence to Santadelg, which Sylvia Delgado had formed three days earlier.  The direct transfer of the property to an entity controlled by Delgado's wife supports an inference that Delgado designed the transaction to disguise the illegal nature and source of the funds he used to finance the property transfer.  *See United States v. Bowman*, 235 F.3d 1113, 1116 (8th Cir. 2000) (an intent

---

[2]We need not consider the evidence of intent to conceal in the Lawndale transaction, because the jury's finding that Delgado acted with an intent to avoid a reporting requirement is sufficient to sustain the conviction.

to conceal the illegal source of proceeds "may be inferred when a defendant transfers those proceeds into the control of others with whom the defendant has a very close relationship"); *cf. United States v. Phythian*, 529 F.3d 807, 813 (8th Cir. 2008) ("Where a defendant commingles illegal proceeds with the identity or the funds of a legitimate and usually preexisting business . . . [s]uch commingling effectively conceals the nature, source, ownership, and/or control of the unlawful proceeds.") (alteration and omission in original) (internal quotations omitted).  The evidence was therefore sufficient for a reasonable jury to conclude that Delgado engaged in money laundering with intent to conceal.

On the conspiracy count, the government produced ample evidence – including recorded phone conversations, financial documents, and testimony from Sparks and Canales – from which a reasonable jury could infer that Delgado had an agreement with Canales, Sylvia Delgado, Chavez, and Santa-Anna, to use drug profits in financial transactions with the intent to conceal the illegal nature and source of the money and with the intent to avoid transaction reporting requirements.  The record thus supports a finding beyond a reasonable doubt that Delgado committed the offenses of money laundering and conspiracy to launder money.

\*　　\*　　\*

The judgment of the district court is affirmed.

_____