# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3189

_____

United States of America

*Plaintiff - Appellee*

v.

Milo Vareen Davis

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: May 18, 2012
Filed: August 22, 2012

_____

Before RILEY, Chief Judge, BYE and MELLOY, Circuit Judges.

_____

RILEY, Chief Judge.

A jury convicted Milo Vareen Davis of (1) conspiring to distribute cocaine base (crack) and cocaine in Cedar Rapids, Iowa, from 1997 to 2006, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B), 846 and 851; and (2) money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. Davis appeals his conviction and sentence, arguing the evidence was insufficient to convict him of either crime and "the government engaged in impermissible and tactical preaccusatorial delay in

violation of [his] due process rights." Davis also contends the district court[1] erred by (1) striking the testimony of a defense witness, (2) improperly instructing the jury, (3) failing to dismiss a juror who admitted to knowing a prosecutor and a key witness, and (4) failing to apply the Fair Sentencing Act of 2010 (FSA), Pub. L. No. 111–220, 124 Stat. 2372 (Aug. 3, 2010), retroactively. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

On May 21, 2010, a grand jury returned a two-count indictment charging Davis with (1) conspiring to distribute crack from 1997 to 2006 after a prior felony drug conviction, and (2) laundering the proceeds of his illegal drug sales in July 2005. The grand jury later returned two superseding indictments adding powder cocaine and marijuana as objects of the conspiracy.

Before trial, Davis filed a motion to suppress and a motion in limine, seeking to exclude, among other topics, all references to a February 2, 2000, controlled purchase of crack by a confidential informant because the government destroyed the videotape of the transaction. The district court denied the motions.

On May 23, 2011, the district court began a four-day jury trial. At trial, sixteen witnesses testified about instances where Davis sold large quantities of crack and powder cocaine in Cedar Rapids between 1997 and 2006, often from the Headquarterz Barbershop, which Davis owned and operated. The jury also heard testimony Davis made large cash purchases between 2003 and 2005. In particular, the government presented evidence Davis laundered the proceeds of his drug sales by purchasing a luxury sport utility vehicle in his girlfriend's name.

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

At the jury instruction conference, Davis requested a spoliation instruction permitting the jury to infer the contents of the destroyed surveillance videotape would have been favorable to Davis. The district court declined to give the spoliation instruction, finding no bad faith or any other basis for the instruction. The district court also rejected Davis's proffered multiple conspiracies instruction. The district court concluded the evidence adduced at trial supported the government's theory of a single conspiracy with one overall agreement to achieve its objectives and "different people coming in and out of the conspiracy at different times."

On May 26, 2011, the jury found Davis guilty of conspiracy to distribute crack cocaine and powder cocaine and money laundering, but did not find marijuana was an object of the conspiracy. The district court denied Davis's post-trial motions. On September 20, 2011, the district court imposed concurrent sentences of 360 months imprisonment for the conspiracy and 240 months imprisonment for the money laundering. Davis timely appealed.

## II.   DISCUSSION
### A.   Sufficiency of the Evidence

Davis contends the evidence was insufficient to support his convictions for conspiracy and money laundering. "We review the sufficiency of the evidence de novo, 'viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict.'" United States v. Teague, 646 F.3d 1119, 1121-22 (8th Cir. 2011) (quoting United States v. Piwowar, 492 F.3d 953, 955 (8th Cir. 2007)). We reverse "only if no reasonable jury could have found guilt beyond a reasonable doubt." United States v. Herbst, 666 F.3d 504, 510 (8th Cir. 2012).

#### 1.   Conspiracy

"To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement

to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." United States v. Diaz-Pellegaud, 666 F.3d 492, 499 (8th Cir. 2012) (quoting United States v. Jiminez, 487 F.3d 1140, 1146 (8th Cir. 2007)) (internal quotation marks omitted).

> An agreement to join a conspiracy need not be explicit but may be inferred from the facts and circumstances of the case, and a single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions. Further, it is not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure.

United States v. Slagg, 651 F.3d 832, 840 (8th Cir. 2011) (internal marks and quotations omitted).

Davis argues the numerous cooperating witnesses who testified Davis distributed crack and powder cocaine in Cedar Rapids alleged "individualized buyer-seller relationships with Milo Davis," but did not provide evidence Davis "was the center of a single, ongoing conspiracy lasting 18 years." See United States v. Prieskorn, 658 F.2d 631, 633 (8th Cir. 1981) (explaining buyer/seller relationships alone do not establish a conspiracy to distribute drugs). According to Davis, the government's witnesses did not establish "they entered into any agreement with Milo Davis nor any other witness to distribute narcotics."

Davis's argument is without merit. "[T]he buyer-seller relationship cases upon which [Davis] relies involved only evidence of 'a single transient sales agreement' and small amounts of drugs consistent with personal use." Prieskorn, 658 F.2d at 634 (quoting United States v. Mancillas, 580 F.2d 1301, 1307 (7th Cir. 1978)). Here, the evidence established Davis had ongoing relationships with numerous coconspirators and consistently sold distribution quantities of crack and powder cocaine for most of two decades.

-4-

Darryl Jackson testified that after meeting Davis in 1997, the two men traveled to Chicago, Illinois, together three times to purchase a kilogram of powder cocaine or crack, which they split for resale upon return to Cedar Rapids. See Slagg, 651 F.3d at 841 (recognizing "combining funds to purchase [drugs] is evidence of an agreement to distribute"). From 1999 to 2005, when Jackson and Davis were not in jail, Jackson regularly bought sixty-three grams of powder cocaine from Davis. Davis fronted[2] Jackson cocaine knowing Jackson would distribute the drugs and repay Davis in cash. Jackson also introduced Davis to Christina McGowan, who testified Jackson arranged for her to buy distribution quantities of crack from Davis several times.

Dwayne Morrow testified Davis recruited him to sell drugs when they met in a drug treatment class in September 2004. Davis fronted Morrow one-eighth of a kilogram of crack and told him to return $3,200. After Morrow successfully sold his initial supply of crack and repaid Davis, Davis twice sold Morrow nine ounces of powder cocaine to cook and sell.

Fourteen other witnesses likewise described Davis's extensive crack and powder cocaine distribution operation in Cedar Rapids between 1997 and 2006. Davis's numerous distributors were not only aware of each other's illegal activity, but often witnessed it firsthand, facilitated each other's drug transactions, and even bought drugs from each other. The evidence adduced at trial was more than sufficient to allow a reasonable jury to convict Davis of conspiracy. See Slagg, 651 F.3d at 840-41 (concluding fronting and other "interdependence of the enterprise's participants provides ample support for a reasonable jury's conclusion that they were working together to pursue 'a shared objective to sell large quantities of drugs'" (quoting United States v. Roach, 164 F.3d 403, 412 (8th Cir. 1998))); United States

_____

[2]"'Fronting' denotes a transaction in which the buyer receives drugs on credit and repays the seller from the resale proceeds." Slagg, 651 F.3d at 841 n.3.

v. Pizano, 421 F.3d 707, 719-20 (8th Cir. 2005) (deciding "evidence of distribution of large amounts of [illegal drugs on credit] over a significant period of time" provided "ample evidence to support a reasonable juror's finding . . . ongoing agreements [with coconspirators] for the common purpose of distributing [such drugs]").

### 2. Money Laundering

On July 25, 2005, Davis and his father test drove a 2004 Infiniti QX56 sport utility vehicle originally priced $43,995. The salesman completed a draft purchase agreement for the vehicle listing Davis as the purchaser and his father as the co-buyer. Davis was to make a down payment of $9,500.

The next day, at Davis's request, Jennifer Marie Wilson, Davis's girlfriend, replaced Davis and his father as the buyer of the vehicle. Wilson made a $9,100 down payment with a cashier's check drawn on her bank account. Special Agent Jeff McGuire of the Criminal Investigation Division of the Internal Revenue Service (IRS) analyzed Wilson's bank records and discovered a series of large cash deposits—totaling $9,100—in the days before the check was drawn. Special Agent McGuire's review of Davis's father's account revealed an unusual $9,100 cash deposit on July 27, 2005, which was withdrawn July 30, 2005. Because the cash deposit did not exceed $10,000, the depositor did not need to present identification.

In contrast to the flurry of unusual activity in Wilson's and Davis's father's accounts, Special Agent McGuire reported the business account for Headquarterz "seemed to be used very minimally," which was atypical for a cash business. Special Agent McGuire also noted Davis had no record of filing federal tax returns, possibly indicating Davis had only marginal income.

After Wilson purchased the vehicle, Davis provided Wilson with cash to make the payments, and Davis drove the vehicle exclusively for two months before he and

Wilson moved in together. Special Agent McGuire testified acquiring valuable assets in the names of others is a common means of laundering drug proceeds. Davis's forensic accountant testified the business records and IRS summaries were insufficient to conclude the cash deposits for the vehicle were illegitimate because Davis could make as much as $48,000 per year from the barbershop.

To establish that a defendant laundered money in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove

> (1) defendant conducted, or attempted to conduct a financial transaction which in any way or degree affected interstate commerce or foreign commerce; (2) the financial transaction involved proceeds of illegal activity; (3) defendant knew the property represented proceeds of some form of unlawful activity; and (4) defendant conducted or attempted to conduct the financial transaction knowing the transaction was "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity."

United States v. Phythian, 529 F.3d 807, 813 (8th Cir. 2008) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)). "[C]ircumstantial evidence of a defendant's lack of legitimate income sufficiently establishes that funds defendant used to purchase . . . property are drug proceeds." United States v. Spencer, 592 F.3d 866, 879 (8th Cir. 2010) (citing Pizano, 421 F.3d at 723).

Relying on Wilson's and the forensic accountant's testimonies, Davis contends the government failed to prove Davis "engaged in money laundering with [illegal drug proceeds]." Davis maintains he and Wilson jointly contributed money from legitimate sources to buy the vehicle.

The evidence presented to the jury, viewed in the light most favorable to the government and with all reasonable inferences granted in favor of the verdict, "was

-7-

sufficient to allow the jury to infer that [Davis] used unlawful proceeds" to purchase the vehicle and "conclude that [in buying the vehicle in Wilson's name with a cashier's check drawn on her account, Davis] acted with intent to conceal the illegal nature or source of the funds used." United States v. Delgado, 653 F.3d 729, 737 (8th Cir. 2011).

Government witnesses testified Davis received considerable profits from his drug sales, had large amounts of cash, and "used the cash in a way that avoided leaving records." Id. at 737. Wilson's and Special Agent McGuire's testimonies indicated Davis deposited most of the $9,100 in cash in Wilson's account. Those funds eventually were drawn by cashier's check to make the down payment on a vehicle titled in Wilson's name despite Davis selecting the vehicle, negotiating its purchase, making most of the payments, and exclusively driving it for two months. A reasonable jury could find Davis guilty of money laundering beyond a reasonable doubt.[3]

---

[3]Davis also argues, for the first time on appeal, that his drug conspiracy and money laundering convictions impermissibly may have "merged." See United States v. Santos, 553 U.S. 507, 516 (2008) (plurality opinion) (discussing the possibility that a broad interpretation of the term "proceeds" in the money laundering statute could, in some cases, make nearly every violation of the underlying criminal statute a violation of the money laundering statute). Even if properly raised, see United States v. Merritt, 982 F.2d 305, 306-07 (8th Cir. 1992) ("This court will not consider an issue raised for the first time on appeal absent a showing of plain error resulting in a miscarriage of justice."), Davis's argument would fail because "Santos does not apply in the drug context." Spencer, 592 F.3d at 879.

**B.    Pre-Indictment Delay**

Davis contends "the government engaged in impermissible and tactical preaccusatorial delay in violation of [Davis's] due process rights." "We review federal constitutional questions de novo." United States v. Jones, 574 F.3d 546, 553 (8th Cir. 2009) (quoting United States v. Honken, 541 F.3d 1146, 1170 (8th Cir. 2008)) (internal quotation marks omitted).

"The Fifth Amendment's Due Process Clause protects a criminal defendant against unreasonable pre-indictment delay." United States v. Gladney, 474 F.3d 1027, 1030 (8th Cir. 2007). To establish a violation of his due process rights, Davis must prove "(1) the delay resulted in actual and substantial prejudice to the presentation of the defense; and (2) the government intentionally delayed his indictment either to gain a tactical advantage or to harass him." United States v. Haskell, 468 F.3d 1064, 1070 (8th Cir. 2006). "If the defendant fails to establish actual prejudice, we need not assess the government's rationale for the delay." United States v. Sprouts, 282 F.3d 1037, 1041 (8th Cir. 2002).

Davis's delay claim derives from the time elapsed between a controlled crack buy in February 2000 and the conspiracy indictment in this case. At trial, Angelo Olds testified he acted as a confidential informant during a controlled crack buy from Davis on February 2, 2000. Before the transaction, law enforcement officers gave Olds $350 in marked currency and fitted him with a recording and transmitting device. Officers observed Olds get into a Ford sport utility vehicle occupied only by a male driver. After Olds exchanged the marked currency for crack, the officers terminated surveillance and did not follow the marked currency or make an arrest.

At a suppression hearing, Chris York, the United States Drug Enforcement Agency (DEA) agent assigned to Cedar Rapids beginning in 2006, testified the investigation stalled because officers reportedly could not locate Olds. Davis maintains the officers should have had no trouble locating Olds anytime before

Davis's arrest in 2006. Agent York further testified the DEA, pursuant to DEA policy, destroyed the videotape of the controlled buy in 2002 when the United States Attorney declined to prosecute Davis. DEA policy would also have permitted returning the videotape to the case file. When Davis's attorney first asked about the videotape, the government told him the videotape was destroyed by a flood in 2008.

Davis asserts the government's failure to prosecute him until eight years after the February 2, 2000 controlled buy, combined with the 2002 destruction of the surveillance videotape, constituted an unreasonable pre-indictment delay. The government's "failure to preserve evidence does not constitute a denial of due process unless the state acted in bad faith, the evidence had apparent exculpatory value and comparable exculpatory evidence was not reasonably available to the defendant." United States v. Malbrough, 922 F.2d 458, 463 (8th Cir. 1990) (citing California v. Trombetta, 467 U.S. 479, 488-89 (1984)); see also United States v. Scoggins, 992 F.2d 164, 167 (8th Cir. 1993) (explaining the Supreme Court held in Arizona v. Youngblood, 488 U.S. 51, 58 (1988), "that unless a defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute denial of due process of law"). According to Davis, the "bad faith destruction of this potentially exculpatory videotape resulted in actual prejudice to Davis, which amounted to a violation of his rights to due process." We disagree.

Davis fails to show any actual and substantial prejudice to his defense. Davis contends the videotape "potentially" could have revealed someone else was the seller, but Davis is unable to show the videotape had any apparent exculpatory value before the DEA destroyed it. See Trombetta, 467 U.S. at 488-89 (determining, to have "constitutional materiality," evidence must "possess an exculpatory value that was apparent before the evidence was destroyed"). The DEA believed the evidence was sufficient to convict Davis of distributing crack and submitted the case to the United States Attorney. The DEA preserved the evidence until the United States Attorney declined to prosecute in 2002. When the investigation closed, the DEA destroyed the

videotape and other evidence pursuant to established DEA policy. The officers' actions indicate that at the time the DEA destroyed the videotape, the officers believed the videotape was "much more likely to provide inculpatory than exculpatory evidence." Trombetta, 467 U.S. at 489.

If Davis were prejudiced at all as a result of the DEA destroying the videotape, the prejudice was not constitutionally material. See United States v. Jackson, 446 F.3d 847, 851 (8th Cir. 2006) ("Alleged prejudice is insufficient to establish a due process violation if it is insubstantial, speculative, or premature."). "It is well-established in this circuit that, in this due process inquiry, an assessment of the nature and degree of the prejudice resulting from the missing evidence must be made in light of the overall strength of the government's case." United States v. Benshop, 138 F.3d 1229, 1234 (8th Cir. 1998). To cause substantial prejudice, the absence of the videotape must "impair the fairness of the trial." United States v. Bartlett, 794 F.2d 1285, 1292 (8th Cir. 1986) (quoting United States v. Solomon, 686 F.2d 863, 871 (11th Cir. 1982)) (internal quotation marks omitted).

Olds's testimony about the controlled buy was just one of dozens of transactions described by the government's witnesses. Olds himself described eight or nine other crack purchases he made from Davis. Davis was able to cross-examine Olds and challenge his testimony about Davis's drug activity even without the videotape. Given the strong evidence of Davis's guilt, any prejudice Davis suffered was insufficient to sustain a due process claim. See Bartlett, 794 F.2d at 1293 (concluding "the requirement of actual substantial prejudice" was not met because the lost evidence was of "limited probative value when considered against the evidence in the record").

Davis also fails to provide any probative evidence the DEA destroyed the videotape in bad faith or to gain some tactical advantage. Davis's speculation about the controlled buy and his questions about "the integrity of the information provided

[to] the defense and the courts" regarding the DEA's inability to locate Olds and its initial explanation for the destroyed videotape do not establish bad faith or an intent to gain a prosecutorial advantage. See United States v. Einfeldt, 138 F.3d 373, 377 (8th Cir. 1998) (finding "no evidence of bad faith" where "the police had reasonable explanations why [evidence] was destroyed").

Davis generically claims the "pre-indictment delay was used by the [g]overnment to gain a tactical advantage against Davis," but never adequately explains what advantage the government gained. The record evidence reasonably indicates the DEA destroyed the videotape not to gain some tactical advantage in a conspiracy case eight years later, but as part of the DEA's routine procedures given the government's decision not to prosecute. Cf. United States v. Webster, 625 F.3d 439, 447 (8th Cir. 2010) (determining "there [was] no evidence of bad faith . . . which would constitute a due process violation" resulting from the destruction of evidence when the record showed the responsible officer was, at most, negligent in following agency procedure). The district court did not err in ruling Davis did not suffer an unconstitutional pre-indictment delay.

### C.    Stricken Testimony

At trial, three government witnesses testified they knew of instances between 2004 and 2006 where Davis sold large quantities of crack and powder cocaine to Iregous Parks. One witness testified Parks identified Davis as his drug source. In defense, Davis called Parks to refute the testimony indicating Parks and Davis transacted drugs together. On direct examination, Parks denied any drug connection to Davis.

On cross-examination, the government asked Parks to identify the source of his drugs. When Parks asserted his Fifth Amendment privilege against self-incrimination, and after hearing the parties' arguments, the district court struck all of Parks's testimony at the government's request. Davis contends the district court abused its

discretion in striking Parks's testimony.  See United States v. Brierly, 501 F.2d 1024, 1027 (8th Cir. 1974) (standard of review).

> [T]he testimony of a witness on direct examination may be used . . . even though a witness asserts the privilege against self-incrimination upon cross-examination where the testimony sought to be elicited goes to collateral matters or the credibility of the witness.  If, however, the witness—by invoking the privilege—precludes inquiry into the details of his direct testimony so that there is a substantial danger of prejudice, the direct testimony should be stricken in whole or in part.

Id.  The crux of this issue, then, is whether Parks's refusal to identify the source of his drugs goes to a collateral matter or the details of his direct testimony.  The district court decided Parks was "refusing to submit to cross-examination on a direct matter, a matter that is at the heart of this case," and struck Parks's testimony in its entirety.  See United States v. Doddington, 822 F.2d 818, 822 (8th Cir. 1987) (explaining the trial court properly struck a witness's testimony because the witness refused to "answer proper, relevant questions on cross examination 'going directly to the heart of his testimony on direct examination' caused his direct testimony to become hearsay" because the testimony no longer was "subject to cross examination" (quoting United States v. Frank, 520 F.2d 1287, 1292 (2d Cir. 1975))).

Direct trial testimony, without cross-examination, may not be hearsay by definition today.  See Fed. R. Evid. 801(c) ("'Hearsay' means a statement [offered for the truth of the matter asserted that] the declarant does not make while testifying at the current trial.").  However, an opposing party is entitled to cross-examine a witness on "the subject matter of the direct examination," Fed. R. Evid. 611(a) & (b), and the district court's decision in this case is a fair one and "promote[s] the development of evidence law[] to the end of ascertaining the truth and securing a just determination," Fed. R. Evid. 102.

Davis asserts the question about the source of Parks's drugs "was not directed at the details of Park's [sic] testimony, but rather the collateral matters of Park's [sic] plea agreement to unrelated charges." The government contends the identity of the source of Parks's illegal drugs was at the heart of Parks's testimony that he purchased drugs, but not from Davis.

In support, the government relies on United States v. McKneely, 69 F.3d 1067, 1076 (10th Cir. 1995), in which the Tenth Circuit affirmed the trial court striking the testimony of a witness who "[d]uring direct examination . . . denied that [the] defendant supplied the drugs at issue without naming the source" because "the government on cross-examination was obviously attempting to test that assertion" and could not effectively do that when the witness refused to answer the government's questions. The Tenth Circuit determined "the identity of the source was central to the issue of defendant's guilt or innocence." Id.; see also Lawson v. Murray, 837 F.2d 653, 656 (4th Cir. 1988) (finding the trial court properly struck testimony of a witness invoking the Fifth Amendment who "was clearly attempting to say just enough to exonerate [the defendant] without implicating himself" and "was trifling with the truth" because the "prosecutor was entitled to closely examine the witness . . . to expose to the fact finder [the witness's] falsification"). The reasoning of these cases is persuasive.

"Striking the testimony of a witness is a drastic remedy not lightly invoked." McKneely, 69 F.3d at 1076 (citing Lawson, 837 F.2d at 656). But we agree with the government that Parks's refusal to identify his drug source "prevented the government from being able to fully cross examine [Parks] by testing his assertion that he had not engaged in drug transactions with [Davis]." The district court did not abuse its discretion in striking Parks's testimony.

-14-

**D.    Jury Instructions**

**1.    Spoliation**

Davis contends the district court's refusal to give a spoliation instruction based upon the DEA's destruction of the videotape violated his constitutional due process rights. Davis's arguments on this point are admittedly reiterative of his suppression arguments because, in Davis's view, "the same due process concerns that inform the suppression analysis underpin the [district court's] refusal to instruct the jury on spoliation." Davis's failure to show the videotape was exculpatory or that the DEA destroyed the videotape in bad faith is again fatal to his due process claim.

As Davis acknowledges, we have never "applied the law of spoliation in a criminal case." See United States v. Miell, 661 F.3d 995, 1000 n.5 (8th Cir. 2011) (reserving the issue). Even if we assume the spoliation doctrine applies in this context, "[s]evere spoliation sanctions, such as an adverse inference instruction, are only appropriate upon a showing of bad faith." Stepnes v. Ritschel, 663 F.3d 952, 965 (8th Cir. 2011); accord United States v. Lanzon, 639 F.3d 1293, 1302-03 (11th Cir. 2011) (assuming the spoliation doctrine applied in a criminal case and concluding the trial court did not abuse its discretion in denying a proposed jury instruction because the defendant failed to show bad faith or prejudice).

To warrant such an instruction, a defendant generally must establish record evidence supporting "an inference that the police acted improperly by destroying any evidence." United States v. Larsen, 427 F.3d 1091, 1095 (8th Cir. 2005). This Davis fails to do. Davis's attempt to fashion bad faith out of the government's purported "conflicting and inadequate explanations of why the destruction took place" again falls short.

Davis alternatively contends bad faith is irrelevant because "[t]he destruction of materially exculpatory evidence violates the defendant's due process rights, regardless of whether the government acted in bad faith." See Trombetta, 467 U.S.

-15-

at 488-89; see also Youngblood, 488 U.S. at 57 (explaining "the good or bad faith of the State [is] irrelevant when the State fails to disclose to the defendant material exculpatory evidence"). Davis's contention on this point also falls short because he has not shown the videotape is exculpatory or material. The government's constitutional obligation to preserve evidence "must be limited to evidence that might be expected to play a significant role in the suspect's defense." Trombetta, 467 U.S. at 488. Because Davis failed to show the videotape would have played such a role, the district court did not err in refusing Davis's proposed spoliation instruction.

### 2.     Multiple Conspiracies

We also reject Davis's proposition that the district court's failure to give Davis's proposed multiple conspiracies instruction requires a new trial. "If the evidence supports a single conspiracy, the failure to give a multiple conspiracy instruction is not reversible error." Roach, 164 F.3d at 412.

> Whether a given case involves single or multiple conspiracies depends on "whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." United States v. Massa, 740 F.2d 629, 636 (8th Cir. 1984) (internal quotation omitted). This is determined by the totality of the circumstances, and because it is a question of fact, we draw all reasonable inferences in favor of the verdict. United States v. McCarthy, 97 F.3d 1562, 1571 (8th Cir. 1996). Relevant factors "includ[e] the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred." Id. (internal quotation omitted).

United States v. Radtke, 415 F.3d 826, 838-39 (8th Cir. 2005).

The evidence supported a reasonable jury finding one overall agreement to distribute crack and powder cocaine in Cedar Rapids as charged in the indictment. Insisting "the conspiracy claimed was divided into at least three periods," Davis

-16-

questions the jury's verdict based on the existence of other "top-level suppliers," "changing actors," "change in roles," "breaks in the timeline," and "testimony concerning various activities during different periods of time." But none of those factors precluded the jury from finding a single overarching conspiracy under the circumstances of this case. See, e.g., Slagg, 651 F.3d at 842 (concluding a reasonable jury could infer a single conspiracy from similar circumstances).

"A single overall conspiracy can be made up of a number of separate transactions and of a number of groups involved in separate crimes or acts." United States v. McGilberry, 620 F.3d 880, 885-86 (8th Cir. 2010) (quoting Roach, 164 F.3d at 412) (internal quotation marks and alterations omitted). "A multiple conspiracy instruction is not required just because there are a number of sources and independent dealers if there was a shared objective to 'sell large quantities of drugs.'" Roach, 164 F.3d at 412 (quoting United States v. Cabbell, 35 F.3d 1255, 1262 (8th Cir. 1994)). Such is the case here.

"[J]ust as the litany of interrelated relationships recounted above could permit the jury to infer more than episodic buyer-seller transactions, so it could permit the jury to infer more than a series of multiple, smaller conspiracies." See Slagg, 651 F.3d at 841. "That various conspirators join[ed] at different times, change[d] roles, or depart[ed] from the conspiracy d[id] not convert a single conspiracy into multiple ones." United States v. Delgado, 653 F.3d 729, 736 (8th Cir. 2011). "And the fact[s] that [Davis] may have competed with some of his coconspirators," id. (quoting United States v. Jeffers, 570 F.3d 557, 568 (4th Cir. 2009)) (internal marks omitted), and was incarcerated "for a brief period [did] not prove the existence of a different conspiracy," United States v. Dinwiddie, 618 F.3d 821, 832-33 (8th Cir. 2010). The trial record supports a finding of a single conspiracy. The district court's rejection of Davis's multiple conspiracies instruction was not reversible error.

**E. Juror No. 1**

On May 23, 2011, during voir dire, the magistrate judge assigned to conduct jury selection in Davis's case asked the jury venire if any of them knew the attorneys in the case, including Assistant United States Attorney (AUSA) Patrick J. Reinert. One prospective juror, Juror No. 1, indicated she believed another AUSA who was not involved in the case attended her church and stated it would not affect her decision. Juror No. 1 did not report any familiarity with AUSA Reinert. Juror No. 1 also did not respond when asked if she knew Special Agent McGuire when he was identified by name as a witness for the government. Juror No. 1 was placed on the jury.

At trial, after Special Agent McGuire took the witness stand, Juror No. 1 notified court security that she recognized the agent from her church and that she also had done some volunteer work with AUSA Reinert's wife, and possibly with AUSA Reinert himself, approximately ten years before trial. The district court interviewed Juror No. 1, who maintained she could be fair and impartial and indicated her prior associations would not affect her decisions in the case. The district court denied Davis's request to use an alternate juror, finding Juror No. 1's prior associations did not rise to the level of a challenge for cause. The district court also denied Davis's post-trial motions alleging juror bias.

Davis contends the district court's failure to remove Juror No. 1 after she disclosed her familiarity with AUSA Reinert and Special Agent McGuire "was an abuse of discretion, and deprived Milo Davis of his right to a fair and impartial jury." We disagree.

"A district court's decision to remove or not remove a juror is reviewed for an abuse of discretion." United States v. Running Horse, 175 F.3d 635, 638 (8th Cir. 1999). To obtain a new trial based on juror bias, Davis must "prove three things about the voir dire: 1) that [Juror No. 1] answered dishonestly, not just inaccurately;

-18-

2) that she was motivated by partiality; and 3) that the true facts, if known, would have supported striking her for cause." United States v. Tucker, 137 F.3d 1016, 1026 (8th Cir. 1998) (footnote omitted) (citing McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984) (explaining only those "motives for concealing information . . . that affect a juror's impartiality can truly be said to affect the fairness of a trial")). "To challenge for cause, a party must show actual partiality growing out of the nature and circumstances of the particular case." Id. at 1029 (quoting United States v. Bascope-Zurita, 68 F.3d 1057, 1063 (8th Cir. 1995)) (internal marks omitted). Davis fails all three steps.

We agree with the government "there is no evidence [Juror No. 1] answered a question during *voir dire* in a deliberately dishonest fashion" or "was motivated by partiality." The record indicates Juror No. 1 intended no dishonesty and instead merely failed to recognize AUSA Reinert and the name of Special Agent McGuire during voir dire. Though Davis finds Juror No. 1's temporary memory lapse "inexcusable," Davis concedes the juror's "answers were not outwardly dishonest." When Juror No. 1 recognized the mistake, she immediately notified the court and took steps to correct it. If anything, "[Juror No. 1's] honesty is reflected by her self-disclosure." United States v. Ruiz, 446 F.3d 762, 771 (8th Cir. 2006) (reasoning "[t]here simply [was] no dishonesty in the juror's response [at voir dire that she did not know any of the defendants] to support an allegation of bias" where the juror notified the courtroom deputy of her concern about a potential problem when she realized she knew one of the defendant's relatives).

Juror No. 1's proactive corrective actions also foil Davis's unsupported claims of partiality.

> The courts presume that a prospective juror is impartial, and a party seeking to strike a venire member for cause must show that the prospective juror is unable to lay aside his or her impressions or

opinions and render a verdict based on the evidence presented in court. United States v. Wright, 340 F.3d 724, 733 (8th Cir. 2003). "Essentially, to fail this standard, a juror must profess his inability to be impartial and resist any attempt to rehabilitate his position." Moran v. Clarke, 443 F.3d 646, 650-51 (8th Cir. 2006).

United States v. Dale, 614 F.3d 942, 959 (8th Cir. 2010).

Rather than hiding her knowledge or professing unwavering partiality and resisting rehabilitation, Juror No. 1 disclosed her acquaintances and unequivocally stated she would be fair and impartial and would not base her decisions on her limited knowledge of AUSA Reinert and Special Agent McGuire. Given the complete lack of any evidence of a motive for partiality, the district court did not abuse its discretion in accepting Juror No. 1's assurances and refusing Davis's request to use an alternate. See Dale, 614 F.3d at 959 ("[A] district court does not abuse its discretion by refusing to excuse a challenged juror after the juror affirmed their [sic] impartiality and the judge favorably evaluated their demeanor.").

### F. FSA Retroactivity

The jury convicted Davis of conspiring to distribute crack and powder cocaine between 1997 and 2006. The FSA, which took effect August 3, 2010, increased the drug quantities needed to trigger statutory mandatory minimum sentences in crack cases. On September 20, 2011, the district court, expressly following our binding precedent, rejected Davis's request to apply the FSA retroactively in sentencing Davis to 360 months imprisonment. See United States v. Sidney, 648 F.3d 904, 910 (8th Cir. 2011) (holding "the FSA is not retroactive, even as to defendants who were sentenced after the enactment of the FSA where their criminal conduct occurred before the enactment"), abrogated by Dorsey v. United States, 567 U.S. ___, 132 S. Ct. 2321 (2012). In Dorsey, the Supreme Court held "the new, more lenient mandatory minium provisions" of the FSA "apply to offenders who committed a

-20-

crack cocaine crime before August 3, 2010 but were not sentenced until after August 3." Dorsey, 567 U.S. at ___, 132 S. Ct. at 2326.

The government acknowledges "the provisions of the FSA should apply" to Davis in light of Dorsey, but maintains Davis "is still subject to a mandatory minimum sentence of 20 years' imprisonment under 21 U.S.C. § 841(b)(1)(A) because the [5,163.06 grams of crack the district court found] in [Davis's] offense exceeds 280 grams," the new amount needed to trigger the twenty-year statutory minimum under the FSA. See United States v. Webb, 545 F.3d 673, 677 (8th Cir. 2008) ("[A] district court may impose a sentence based on a drug quantity determination greater than that found by the jury so long as the sentence does not exceed the statutory maximum of the convicted offense and the district court's calculation is supported by sufficient evidence. This is true even where the district court's finding subjects a defendant to a lengthier mandatory minimum sentence than that which would be applicable based solely on the jury's quantity determination.") (internal citations omitted). The government also asserts any "error in applying a 20 year mandatory minimum sentence was harmless" because "[a]pplying the FSA to [Davis] would not alter the [United States Sentencing Guidelines (U.S.S.G. or Guidelines)] range or change [Davis's] statutory maximum sentence of life." Davis contends the mandatory minimum under the FSA is "is ten years *not twenty*" because "the jury found that [Davis] conspired to distribute more than 50 grams of [crack]—not more than 280 grams."

We agree with the government that any error in failing to apply the FSA retroactively was harmless under the circumstances of this case. See Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). The district court found Davis responsible for 5,163.06 grams of crack and 3,649.15 grams of powder cocaine, which resulted in an adjusted offense level of 36. See U.S.S.G. § 2D1.1. Because the adjusted offense level of 40 for the money laundering conviction was higher, the district court applied that level

to both counts, determining Davis was subject to an advisory Guidelines range of 360 months to life imprisonment for his conspiracy conviction (level 40, category IV). See U.S.S.G. § 3D1.3(a) (explaining the offense level that applies to a group of closely related offenses is "the highest offense level of the counts in the [g]roup"). In sentencing Davis, the district court found "a basis to go . . . above the low end of the advisory guideline range of 360 months" to life but concluded a 360-month sentence was "supported by the evidence . . . and sufficient but not greater than necessary to achieve the goals of sentencing."

Davis does not challenge the government's contention the FSA did not change Davis's advisory Guidelines range and does not even attempt to explain why Davis believes he is subject to a ten-year mandatory minimum despite our holding in Webb.

Davis also fails to point to anything suggesting the district court would impose a different sentence on remand. In sentencing Davis, the district court stated 360 months was the appropriate sentence for the conspiracy conviction "whether the [FSA] were applied or not applied." We see no compelling reason to remand this case for resentencing.

## III.   CONCLUSION

We affirm Davis's conviction and sentence.

_____